## GARZOT v. DE RUBIO.
## BURSET v. SAME.
## BURSET v. SAME.

APPEALS FROM THE DISTRICT COURT OF THE UNITED STATES FOR PORTO RICO.

Nos. 141, 142, 604. Argued February 27, 28, 1908.—Decided April 6, 1908.

The power of this court to review judgments of the District Court of the United States for Porto Rico given by § 35 of the act of April 12, 1900, 31 Stat. 85, is the same as that to review judgments of the Supreme Courts of the Territories and is controlled by § 2 of the act of April 7, 1874, 18 Stat. 27; on writ of error, therefore, this court is confined to such legal questions as necessarily arise on the face of the record, such as exceptions to rulings on the rejection and admission of testimony and the sufficiency of the findings to sustain the decree based thereon.

In this case the facts sustained the plaintiff's contention that she was a citizen of Spain and as to that point there was no ground for dismissal for want of jurisdiction.

A bill in equity to set aside an agreement adjusting a community between the widow and children, brought after the death of the widow who had also left children by a second marriage, held in this case, to be a liquidation of the community, and, although the property was derived solely from the first husband; the children of the second marriage were, as heirs of the mother, interested in her share and necessary parties to the bill.

In establishing a civil government for Porto Rico Congress by § 33 of the act of May 1, 1900, in scrupulous regard for local institutions and laws, preserved the local courts and recognized their jurisdiction over local affairs, including matters of probate jurisdiction.

By art. 62, par. 5, of the Porto Rican Code, power to administer estates is exclusively vested in the judge of the last place of residence of the deceased, and this includes all actions incidental to the liquidation of a community existing between husband and wife, and the District Court of the United States for Porto Rico has not jurisdiction of an action to set aside an agreement of liquidation of a community where the estates are still open in, and subject to the power and authority of, the local court.

THE facts are stated in the opinion.

Mr. N. B. K. Pettingill and Mr. George H. Lamar for appellants.

*Mr. Francis H. Dexter* and *Mr. Fredric D. McKenney* for appellee.

MR. JUSTICE WHITE delivered the opinion of the court.

These several appeals were taken by the various appellants from the same decree. We dispose of them together. The transcript is voluminous and confused. Following the order of the court below and the direction of the counsel for all the appellants, not objected to by the counsel for the appellee, the transcript contains all the proceedings, all the testimony offered at the hearing, together with the opinion as well as the elaborate findings of fact and conclusions of law by which the court below disposed of the case. The many assignments of error proceed upon the assumption that every question arising from the transcript is open for our consideration.

Our power to review is derived from § 35 of the act of April 12, 1900 (31 Stat. 85), which provides "that writs of error and appeals from the final decisions . . . of the District Court of the United States (for Porto Rico) shall be allowed and may be taken to the Supreme Court of the United States in the same manner and under the same regulations . . . as from the Supreme Courts of the territories of the United States." Our jurisdiction over causes coming from the Territories generally was thus stated in *Idaho & Oregon Land Co.* v. *Bradley,* 132 U. S. 509, 513:

"Congress has prescribed that the appellate jurisdiction of this court over 'judgments and decrees' of the Territorial courts, 'in cases of trial by jury, shall be exercised by writ of error, and in all other cases by appeal;' and ' on appeal, instead of the evidence at large, a statement of the facts of the case in the nature of a special verdict, and also the rulings of the court on the admission or rejection of evidence when excepted to, shall be made and certified by the court below,' and transmitted to this court with the transcript of the record. Act of April 7, 1874, c. 80, sec. 2, 18 Stat. 27, 28."

And, as pointed out in the same case (p. 513), followed since in a long line of cases:

"The necessary effect of this enactment is that no judgment or decree of the highest court of a Territory can be reviewed by this court in matter of fact, but only in matter of law. As observed by Chief Justice Waite: 'We are not to consider the testimony in any case. Upon a writ of error, we are confined to the bill of exceptions, or questions of law otherwise presented by the record; and upon an appeal, to the statement of facts and rulings certified by the court below. The facts set forth in the statement which must come up with the appeal are conclusive on us.' *Hecht* v. *Boughton,* 105 U. S. 235, 236."

While the suggestion that because there is no intermediate reviewing court between this and the District Court of the United States for Porto Rico, differing from what is generally the case in the Territories of the United States, a wider scope of authority should exist in reviewing by appeal the decrees of the District Court of Porto Rico, may have cogency, it affords no ground for disregarding the plain command of the statute of 1874, which is here applicable, as expounded by many previous decisions of this court. It follows that the greater part of the transcript is superfluous, and we therefore disregard it and confine our attention to such legal questions as necessarily arise on the face of the record, viz., to rulings concerning the rejection or admission of testimony duly excepted to, and to the sufficiency of the findings to sustain the legal conclusion or decree based on them.

The sole complainant, Maria Rios de Rubio, a widow, was averred to be "a resident of San Juan, Porto Rico, and a loyal subject of the King of Spain." There was no specific traverse of this averment. The court expressly found "that the citizenship and residence of the parties was as alleged in the bill of complaint." After the findings of fact had been made and the decree entered, and after an appeal by one of the parties, other of the defendants who had initiated appeals, but had not perfected them, moved for an extension of time to perfect

their appeals and for an opening of the decree, on the ground that when the bill was filed complainant was not a citizen of Spain but of Porto Rico, and, therefore, the court never had jurisdiction of the case. This motion was entertained by the judge then presiding, who succeeded in office the judge by whom the cause was tried. After hearing the evidence offered by both parties and analyzing the same, it was found that the complainant was a citizen of Spain as alleged. The motion to reopen was therefore denied. Without stopping to review the elaborate discussion of the subject on behalf of the appellants, we content ourselves with saying that we think the facts upon which the court based its action sustain that conclusion, and therefore the contention as to want of jurisdiction, because of the alleged absence of Spanish citizenship of the complainant, is without merit.

In approaching the merits we put out of view for the moment the many assignments of error which are addressed to rulings of the court admitting or rejecting evidence, and reserve for ulterior determination whether in view of the state of the record such objections are open, and if they are, whether any of them are well taken.

In order to a clear understanding of the origin of the controversy, we state the facts out of which it arose, confining ourselves to those shown by the pleadings or documents made a part thereof or established by the findings below.

José Maria Rios and Manuela Gutman were married in Porto Rico in 1866. There being no marital contract to the contrary, a legal community of property, as defined in the Spanish law, supervened between the spouses.

The wife at the time of the marriage had eight thousand pesos of separate money and the husband about half that amount. During the nine years which intervened, between the marriage and September 8, 1875, the husband had become the owner of various pieces of real estate, seven or eight of which were situated in the district of Naguabo, and one, or maybe two or more, in the district of Humacao. On Septem-

ber 8, 1875, the husband, Rios, died leaving surviving him his widow, Manuela, and three minor children, the issue of the marriage, viz., two daughters, the one Petronila and the other Maria, and a son, José. On the night of his death the husband executed a power of attorney, authorizing his wife to make a last will on his behalf, and on September 12 following, in virtue of this power, the wife executed the will. As the document was in no respect dispositive, but purely declaratory of the rule of legal succession, its effect on this controversy may be put out of view. By the law of Spain the three children were the heirs of the estate of their father, less the mother's share of the community estate, if any, subject to the usufruct of the mother on her husband's estate and subject to a marital fourth in favor of the wife, if the circumstances justified such an allowance. The widow instituted the necessary preliminary probate proceedings in the proper court to open the estate, and became executrix and the tutrix of her minor children and usufructuary of their estate, and, in one or both capacities, went into possession and control of the entire property, including in such property her community estate, if any there was. Two years after the widow married Miguel Bustelo.

In November, 1887, José, the son by the first marriage, being yet a minor, died intestate, and his mother, Manuela, instituted in the proper court proceedings concerning the estate of her deceased son. It may be conceded that the mother, as the immediate ascendant, was the sole heir of the son, to the exclusion of the sisters, the estate taken by her, however, being only usufructuary in character since at her death, as the estate of the son had come to him as part of his paternal inheritance (the succession of his father), it reverted to the sisters, children of the father—because of the principle of the Spanish law which took into account the source whence the estate of the son had been derived, for the purpose of regulating its transmission by death.

In 1890 the daughter Maria married one Rubio, and in 1898 Petronila, the other daughter, married one Noyas. In the

·meanwhile five children were born of the marriage between Manuela Gutman and Bustelo, and the latter died, leaving surviving him his. widow and these five children. From the death of the first husband, in 1875, to January, 1901, Manuela Gutman possessed and controlled all the property which she entered into possession of at the date of the :death of her first husband, without rendering accounts of her administration to the court in which the estate had been opened, although that court had full power to control and direct her administration.

The daughters, before their marriage, generally lived with their mother and were educated and supported by her, and after their marriage received some allowance for their support, the extent of which need not be considered. It is undoubted that after their marriage dissatisfaction on the part of the daughters and their husbands ensued because of the failure of the mother to account and finally settle the estate of the father. This dissatisfaction culminated a short while before January 1, 1901, by the bringing of a suit in the District Court of Porto Rico, in which the succession of the father was pending, seeking to compel the mother to account and distribute the estate. In this suit the daughters were both represented by their attorney, Mr. Cuadra. Shortly after the commencement of this proceeding an asserted understanding was had between the mother and her daughters for the entire settlement of all matters relative to the property which had come into her possession and under her control; as the result of the death of her husband and her minor son, the issue of the first marriage. The settlement was embodied in a. writing dated the sixteenth day of January, 1901, and signed by the parties· and witnesses, among these witnesses being Mr. Cuadra, the lawyer of the two daughters, and Mr. Landron, a lawyer who · represented the mother in the negotiations which preceded the agreement. The agreement, which is in the margin,[1] pur-

[1] First. Dona Manuela Gutman, widow of Bustelo, in her own proper right shall deliver immediately to her daughters by her first marriage, named! Dona Maria Gaudalupe Rios, widow of Rubio, and Dona Petronila Patricia

ported by way of transaction to adjust all controversies as to
the property between the mother and daughters, and to ac-
complish this purpose transferred to the mother in full owner-

Rios de Noya, all the lands and tenements comprised in the plantation known
as "San José de las Mulas," situated in this jurisdiction, with the exception
of a lot of land forty cuerdas in extent, belonging now to the succession of her
second husband, Mr. Bustelo, and acquired by said succession at a public
auction.

Second. In the same manner Senora Gutman shall immediately deliver
to the above-named daughters of her first marriage the lands which form the
estate called "Culo Prieto," in the jurisdiction of Naguabo.

Third. Dona Manuela Gutman shall retain for herself, and as sole and ex-
clusive owner with all property rights, all the lands that may be found re-
maining in the jurisdiction of Naguabo, left at the death of her first husband,
Don José Rios y Berrios, or, approximately nine hundred cuerdas.

Fourth. In view of the fact that by this instrument the co-ownership,
existing until now, in the hereditary estate left at the death of the intestate
Don José Rios y Berrios, becomes finally dissolved, it is by this settlement
understood and agreed that each contracting party hereto becomes the ex-
clusive owner of her share without reservation or limitation of any kind.

Fifth. As soon as this settlement shall be signed before witnesses by the
contracting parties, without prejudice to its being converted into a public
document within the space of forty-eight hours following the day of its date,
or as soon as the notary of this town may return to his office, the lawyers of
Mrs. Gutman and her daughters shall put a stop to all their mutual judicial
proceedings, not only as to the voluntary suit touching the estate of Don
José Rios y Berrios, but also as to all collateral and appellate matters.

Sixth. The lawyers, José Maria Cuadra and Rafael Lopez Landron, the
first representing Dona Maria Guadalupe and Dona Petronila Patricia, and
the second representing Dona Manuela Gutman, become hereby obliged to
conclude this settlement in a manner which shall carry the same to conclusion
without loss of time, so as to leave each interested party in full possession
of what belongs to her by this agreement and furnished with their respective
titles of property as inscribed in the books of the registry, free from every
charge and lien.

Seventh. The expenses of this settlement, that is, the deeds, the expenses
of registration, the means of ratifying this settlement before the courts,
aside from the fees of the lawyers, shall be to the exclusive account of Dona
Manuela Gutman.

Eighth. Moreover, on the occasion of this arrangement, which the inter-
ested parties esteem as highly convenient, Dona Maria and Dona Petronila
find themselves satisfied with the correctness observed by their mother, in
the very troublesome duty of preserving so large an estate for the term of so
many years, in spite of the very serious difficulties overtaking the estate; the
said Mrs. Gutman reserves to herself the right to present to her daughters

ship certain described properties, left by the first husband,
situated in the district of Naguabo, and to the two daughters
in joint equal undivided ownership a certain estate situated
in Naguabo, and also a much larger estate situated in Hu-
macao, both of which also at the death of the first husband
stood in his name and had passed into the possession of his
widow, in virtue of her administration or usufruct.

In April, 1901, Mr. Cuadra, as the attorney of the daughters
Maria and Petronila, and Mr. Landron, as the attorney of the
mother Manuela, instituted in the District Court of Humacao
a proceeding under the Spanish mortgage law to have the legal
title to the property referred to in the agreement put of record.
The prayer was that the property referred to in the agreement
and thereby transferred to the mother be placed of record in
her name as the full owner thereof, and that the property re-
ferred to in such agreement, transferred to the two daughters,
be placed in their names as the full owners. Conformably to

solemn proof of the honesty with which she has acted up to this day, and a
detailed and approved statement of the very grave misfortunes against which
the estate has struggled during the long time in which she has administered
it.

Ninth. Because of her being better acquainted than any other of the in-
terested parties with the claims of all kinds which may now be pending or
are to be established in favor of the estate left at the death of Don José
Maria Rios y Berrios, Mrs. Manuela de Gutman is commissioned to continue
or begin such reclamacions within the shortest time possible, it being well
understood that the amounts obtained from these claims shall be considered
into three equal parts for the advantage and use of Mrs. Gutman and her
said two daughters by her first husband.

Thus the three contracting parties sign before the witnesses who are pres-
ent and the lawyers, who likewise subscribe the same as parties thereto, in
Humacao this 16th day of January, 1901.

(Signed)                    MANUELA G., *Widow of Bustelo.*
                            MARIA RIOS, *Widow of Rubio.*
                            PETRONILA PATRICIA RIOS DE NOYA.
                            Lawyer JOSÉ MARIA CUADRA.
                            Lawyer RAFAEL LOPEZ LANDRON.
                            FRANCISCO NOYA.
                            M. ARGUESO.
                            JESUS ALMIROTY.

the Spanish law, citation was issued to other vicinal owners, and publication in the official gazette of a notice of the application was made under the order of the court. Before the application was acted upon by the court Cuadra withdrew as the counsel of record for the daughter Maria, and Mr. Juan F. Vias appeared on the record as her attorney, and filed in her behalf what is styled "in opposition to the proceedings." The motion by which this was done prayed that the "said proceeding . . . be approved in its main part with the expressed declaration that the properties acquired by Dona Manuela Gutman are so acquired as heir ab-intestate of her son José Rios Gutman and those belonging to his client and to her sister . . . from the inheritance of their deceased father . . . and that in case that this decision should not be deemed proper then that the approval of the proceedings brought be absolutely denied, for the reason that in the petition the true title of the acquisition of the properties adjudicated to the petitioner Senora Gutman, widow of Bustelo, is not set forth therein." In addition, in the record of the proceeding it is recited that for the purpose of the decision of the opposition which he made to the application for the registry of the titles in accordance with the agreement, the lawyer of Maria, Mr. Vias, "accepted as his own the evidence proposed by Lawyers Lopez Landron y Cuadra, with the addition of such documentary evidence as was filed by him and is attached to the record, which said evidence was admitted." The court, on November 16, 1901, allowed the petition for the registry of title according to the agreement and overruled the opposition. The considerations which led the court to this conclusion were thus stated by it:

"Whereas, in accordance with the provisions of sections 1809 and 1816 of the Civil Code, a compromise agreed upon and adjusted between capable persons upon a licit matter is not only a valid and efficient contract, but it further has for the contracting parties the authority of *res judicata;* and .

"Whereas, the opposition to proceedings of dominio au-

thorized by section 395 of the mortgage law is that of third persons cited for the proceeding and introduction of evidence and in no manner can such opposition be made by any of the parties soliciting the said dominio; and

"Whereas, Dona Manuel Rios, I mean Dona Maria Rios, widow of Rubio, is one of the solicitors of the said proceeding, she has signed the compromise which is the basis for instituting the said proceeding, she has agreed upon the adjudication to each of the interested parties according to the terms of the compromise (clauses 3 and 4) she has accepted as her own the corroborative evidence of the very facts of the compromise and she cannot exercise legally against her own acts such actions as could be exercised by strange persons to the institution of dominio proceedings; and

"Whereas, it is left to the court to consider the weight of the evidence introduced and the allegations made approving or disapproving the claims made and making the declarations that the dominio has been justified; and

"Whereas, the court after a consideration of the true value and extent of the evidence introduced it is of the opinion that a writ of approval of this proceeding should issue."

The daughter Maria prosecuted an appeal to the Supreme Court of Porto Rico, sitting as a court of cassation.

We do not refer to many matters discussed at bar concerning the relations between the mother and her daughter Maria which took place pending the appeal, because those subjects are not referred to in the findings. In April, 1902, while the appeal was pending, the mother Manuela sold the properties which had been transferred to her by virtue of the agreement, and had been recorded in her name as full owner, to Victor Burset, who had married one of her daughters by the second marriage. Burset in turn sold the properties to Palmer, and mortgages were put upon them. Palmer sold some of the property to Garzot and Fuertes, and a portion of the land was sold by him to Petronila, the sister of Maria. In June, 1902, Mrs. Manuela Gutman died, and in the same month of the

same year the appeal taken from the decree of the District Court, ordering the titles recorded in accordance with the agreement, was affirmed by the Supreme Court. The court in its opinion, after reciting the appearance and opposition of Maria to the application to register the titles, concluded by observing:

"Considering that even supposing that the construction given by the trial court to article 395 of the mortgage law was erroneous, in holding in one of its conclusions of law that Dona Maria Rios could not oppose the proceeding of dominion because she instituted it in conjunction with her mother Dona Manuela and her sister Dona Petronila, the reversal of the order appealed from would not be proper, as it would be always sustained by the essential and necessary foundation of the same, which is the declaration made by the District Court of Humacao of having been proven the dominion of the properties in question, without any limitation or reservation whatsoever, which declaration cannot be discussed in cassation, because the appeal of cassation was not founded upon paragraph 7 of article 1690 of the Law of Civil Procedure. Considering that the order appealed from conforms to all the claims made by the parties and does not grant more than was prayed for, as it is thereby granted the prayer made by Dona Manuela Gutman and her daughters Dona Maria and Dona Petronila in the petition instituting the *ex parte* proceeding of dominion, and the claim made by Dona Maria through her attorney Don Juan F. Vias is denied."

Again, we do not stop to consider many matters referred to by counsel which it is deemed conclusively show that the daughter Maria accepted the decision of the Supreme Court as final, and acted upon the assumption that she was the owner of the property allotted to her by the agreement, because the matters thus relied upon are also but a part of the evidence and not embraced in the findings below made. About one year after the death of the mother and the decision of the Supreme Court of Porto Rico, the bill by which this cause was

commenced was filed on behalf of the daughter Maria, alleging
herself to be a citizen of Spain.  The only defendants made
to the bill were her sister Petronila, Burset and his wife, Palmer
and his wife, Garzot and Fuertes, and several others, who it
was alleged had acquired an interest in the property sold by
the mother to Burset and by him transferred as above stated.
Demurrers were filed by some of the defendants.  The court
allowed the bill to be amended, and ordered that as amended
it be rewritten.  In substance the bill, as rewritten, alleged
the death of the father, the leaving of the three minor children,
herself included, the death of the brother, and the taking by
the mother of the preliminary probate steps to administer the
property, and the death of the mother.  It alleged that at the
time of his death the father had left certain property, which
was specifically described, the property thus described being
only that which had been transferred to the mother by virtue
of the agreement.  It was alleged that the complainant was
the owner of an undivided half of the property thus described
as heir of her father and brother, and "that the said property
was separate property of said José Maria Rios, theretofore
derived by inheritance from his father and mother and by
purchase from his sisters with his separate funds."  The bill
then with great amplitude alleged a conspiracy and combina-
tion between the mother and sister Petronila to defraud the
complainant by obtaining a title to the property described in
order to benefit the children of the second marriage, and
charged that the lawyers Landron and Cuadra, as parties to
this conspiracy, had united with the mother and sister by de-
ceit and fraud to secure the agreement, concealed or had mis-
represented its contents; and, in furtherance of the same con-
spiracy, prosecuted the proceedings in the courts of Porto
Rico.  It then alleged that in execution of the said conspiracy
the mother had sold the property transferred to her after the
decree putting the title in her name had been rendered by the
District Court; that Burset, the purchaser from her, and all
those holding under him, were cognizant of the fraud and held

fraudulent and simulated titles. No reference was made in the bill, except inferentially, to the property which had been transferred to the complainant by the agreement and which had been put in her name in virtue of the decree of registry. The bill contained an allegation that a copy of the agreement could not be produced because it had been concealed from the complainant, and also contained a charge that the mother had refused to deliver to the complainant the property which had been transferred to her by such agreement. The prayer of the bill was for a decree recognizing complainant as the absolute owner of one-half the property described in the bill, that is, that which had been transferred to the mother; the annulment of the decree of the District Court of Porto Rico, executing the agreement; the erasure of the inscriptions of title resulting therefrom, and for the annulment of the sale to Burset, and all the transfers of title by sale, mortgage or otherwise consequent thereon. Shortly afterwards the bill was amended by detailed averments, charging that the proceedings in the District Court of Porto Rico for the registry of the title were wholly void, that they were instituted by Cuadra in the name of the complainant without authority and with full knowledge on his part that she did not accept the agreement, and consequently not only that decree but the affirmance thereof by the Supreme Court of Porto Rico were without effect upon the rights of the complainant. In accordance with these averments a prayer was inserted, asking that the decrees of both the Porto Rican courts and the registry of title consequent thereon be held to be void. In addition it was prayed "that an account be taken of all the foregoing properties and assets [referring to the properties which had been allotted to the mother by the private agreement], and all other properties in which complainant may have an interest; that a master be appointed to take such accounting and ascertain all the property, real, personal and mixed, belonging to the estate of Don José Maria Rios and Dona Manuela Gutman and Don José Rios y Gutman, and the participation or interest therein which corresponds

to your oratrix, and upon the filing of this report this court shall decree a partition and division thereof in the proportion of one-half to your oratrix, and shall declare by its decree the right of your oratrix as aforesaid in and to the same." Finally, after all the testimony was closed, just prior to the submission of the cause, the court allowed an amendment concerning the value of the pieces of property described in the bill, and which had been allotted to the complainant by the private agreement, and permitted the striking out of the averment that some of those properties had been purchased by the father from his sisters with his separate funds.

The various defendants pleaded *res adjudicata*, based upon the decrees of the District and the Supreme Court putting the agreement of record. Petronila, moreover, pleaded a judgment asserted to have been rendered in a proceeding which it was alleged had been brought by the complainant Maria in an insular District Court to set aside the agreement. Although the judgment thus pleaded purported to be annexed to the plea, it was not so annexed, and no reference to such judgment, if any, or to the suit in which it was rendered, is contained in the findings of fact below. The pleas having been overruled, answers were filed traversing all the charges of fraud as to the agreement, as to the proceedings to enforce the same, and as to the sales or contracts concerning the property which that agreement had transferred to the mother.

The court decreed the agreement to be void for fraud. It decided that the judgment of the District Court, affirmed by the Supreme Court, was void for the same reason. It therefore directed the erasure from the public records of the registry of title which had arisen from the inscription of the judgment. The complainant was held to be the perfect owner, not only of an undivided half of the property which had been allotted to the mother by the agreement, and which was described in the bill, but also a like owner of an undivided half of the property which the agreement had allotted to her, and it was directed that the judgment be inscribed in order to constitute

a muniment of title to the property. Among the findings of fact upon which the decree was based was one finding that although a liquidation and settlement of the estates of the father, mother and son had been prayed, such settlement was not essential, as full relief could be afforded without an accounting.

Before coming to consider such of the assignments of error as are within our cognizance, we are admonished that we must first determine whether the necessary parties are before us to justify us in deciding the case on the merits. And this inquiry also involves determining whether the necessary parties were before the court below to authorize it to make the decree which it entered.

Our duty in the matter was thus stated in *Minnesota* v. *Northern Securities Company,* 184 U. S. 199, 235:

"The established practice of courts of equity to dismiss the plaintiff's bill, if it appears that to grant the relief prayed for would injuriously affect persons materially interested in the subject-matter who are not made parties to the suit, is founded upon clear reasons, and may be enforced by the court, *sua sponte,* though not raised by the pleadings or suggested by the counsel. *Shields* v. *Barrow,* 17 How. 130; *Hipp* v. *Babin,* 19 How. 271, 278; *Parker* v. *Winnipiseogee Lake Cotton and Woolen Co.,* 2 Black, 545."

Again:

"The general rule in equity is that all persons materially interested, either legally or beneficially, in the subject-matter of a suit, are to be made parties to it, so that there may be a complete decree, which shall bind them all. By this means the court is enabled to make a complete decree between the parties, to prevent future litigation, by taking away the necessity of a multiplicity of suits, and to make it perfectly certain that no injustice is done, either to the parties before it, or to others who are interested in the subject-matter, by a decree which might otherwise be granted upon a partial view only of the real merits. When all the parties are before the

court the whole case may be seen; but it may not where
all the conflicting interests are not brought out upon the
pleadings by the original parties thereto.   Story's Eq. Plds.
sec. 72."

Whether the necessary parties are here or were before the
court below involves a consideration of the case in a fourfold
aspect: first, as to the agreement; second, as to the decrees
of the District and Supreme Court; third, as to the contracts
made by the mother or those holding under her in consequence
of the agreement and the registry of the title which it created;
fourth, as to the nature and character of the rights with which
the agreement was concerned, and the effect of the relief
sought in consequence of the prayer for the annulment of that
agreement.

The agreement was made between the complainant, her
sister Petronila and the mother.   Now, although the bill was
brought after the mother's death and alleged the existence
of children of the second marriage, who were, of course, en-
titled to participate in their mother's estate, neither the estate
of the mother nor such children of the second marriage were
made parties to the cause.   But either or both the estate and
these children were necessary parties to the determination
of the rights of the mother under the agreement.   It is no
answer to say they were not because the property with which
the agreement was concerned came from the estate of the first
husband, in which the mother and her children of the second
marriage had no interest, since such an assumption but dis-
regards the nature and character of the title created by the
agreement, and therefore presupposes that its validity could
be judicially determined in the absence of the parties whose
rights were necessarily involved.   And this is also true as to
the judgments of the District and the Supreme Court of Porto
Rico.   The mother was not only a party to those judgments
but a beneficiary thereof, and the presence of her estate or
heirs was essentially necessary to a determination of whether
those judgments were the result of fraud, and the nature and

extent of their operation upon the recorded title. Manifest
also is it that the same reasoning is controlling as to the re-
lief which the bill sought concerning the sale made by the
mother to Burset of the property transferred to her by the
agreement and held by others under or as a consequence of
that sale. We say this because it is apparent that to determine
the validity of the sale or sales in the absence of the estate of
the mother or her heirs would be in effect to pass upon the
rights of the estate or heirs without a hearing. Demonstra-
tive as are the foregoing considerations as to the want of power
in the absence of the estate of the mother or her heirs to annul
the agreement and the title which apparently flowed there-
from, and to collaterally avoid the decrees of the Porto Rican
courts concerning the same and to set aside as simulated and
fraudulent the sales made in virtue of the title at least ap-
parently vested by the agreement, they all become more con-
trolling when the nature and character of the rights with
which the agreement dealt are taken into view. Between the
husband and wife, by virtue of the marriage, in the absence of
a contract to the contrary, a legal community supervened.
Porto Rican Civil Code, Art. 1315. And although the code
was not in force in 1866, when the marriage took place, the
same rule, as we have already said, was then controlling under
the more ancient Spanish law. Partidas, 5 Ll. 57, 59. See also
the statement of the ancient Spanish law on the subject in
*Bruneau* v. *Bruneau,* 9 Martin (La.), 217. The community
thus arising by operation of law embraced all "the earnings
or profits indiscriminately obtained by either of the consorts
during the marriage." Civil Code of Porto Rico, Article 1392.
The community also embraced all "property acquired during
the marriage by onerous title at the expense of the community
property whether the acquisition is made for the community
or for only one of the consorts." Article 1401. Besides it
embraced in the joint ownership many other things which it
is unnecessary to enumerate and which are fully set out in
the articles of the code following those just cited. And the

code, for the purpose of protecting the community and se-
curing a just liquidation of the respective interests in the same,
expressly provides, Article 1407, that "All the property of a
marriage shall be considered as community property until it
is proven that it belongs exclusively to the husband or to the
wife." Although the presumption thus created was not ex-
pressed in the text of the Partidas, it was from ancient times
a part of the Spanish law, having been declared in Ley, 203,
Del Estilo (A. D. 1566), and such presumption common to
both the Code Napoleon and the Louisiana Code (Code Na-
poleon, Art. 1403; Louisiana Code, Art. 2405), was, in express
terms, embodied in Law 5, title 4, book 10, of the Novisima
Recopilacion. In speaking of the ancient Spanish law on the
subject in *Savenat* v. *Le Breton*, 1 Louisiana, 520, 522, the
court said:

"This question must be decided according to the Spanish
laws relating to rights which subsist in the marriage state
between the parties to the matrimonial contract. By these
laws everything purchased during the marriage fell into the
common stock of gains, and at the death of either of the par-
ties was to be divided equally between the survivor and the
heirs of the deceased. And this effect was produced whether
purchases were made with the money or capital of the com-
munity or with that of either of the married parties, whether
in the name of both, or that of one of them separately. See
Febrero add. part 2, lib. 1, chap. 4, sec. 1, no. 6."

And the text of the Novisima concerning the presumption
was expounded and applied by the Supreme Court of Spain
on May 7, 1868, in a case which came before it from Havana.
Jurisprudencia Civil, vol. 17, No. 124, pp. 435–439. It is un-
doubted that all the real estate to which the agreement re-
lated was acquired by the husband after the marriage, and
therefore was controlled, generally speaking, by the presump-
tion of community. True it is, that the bill, as originally
drawn, alleged that some of the property which was trans-
ferred to the mother by the agreement was acquired by in-

heritance by the husband and others by purchase, and that just before the hearing the court permitted an amendment striking out the words "by purchase," so as in effect to cause the bill to allege that the property transferred to the mother by the private agreement had been acquired by the husband by inheritance. But no averment tending in any way to deflect the legal presumption of community as to property acquired during marriage was made concerning the property allotted to the daughters, by the agreement, and which the bill, as amended, sought to administer and distribute. This being the case, it follows that the necessary effect of the bill, as amended, was to assert that, notwithstanding the legal presumption of community, the interest of the deceased wife in the property could be determined without the presence of her estate or of her heirs who were directly interested.

It does not meet this difficulty to suggest that the effect of the agreement was to close the question of community, since the ground upon which the relief was sought was that the agreement was void. Nor is there merit in the suggestion that the presence of the estate of the mother or her heirs was not necessary because the court below found as a fact either that there was no community property, or if there was, that no accounting or liquidation was essential. But these findings could not be made in the absence of the estate of the mother or her heirs without in effect denying a hearing to those vitally interested.

While the considerations previously stated establish the impossibility of affirming, and the necessity for reversing and remanding, they also engender the inquiry whether, in view of the nature and character of the relief sought by the bill, it is our duty to remand for a new trial, or with directions to dismiss the bill because of an inherent want of jurisdiction to give the relief which the bill sought.

Putting out of view for a moment the averments and prayer of the bill relating to the nullity of the private agreement, and the sales made of the property which was transferred by that

agreement to the mother, we think it is patent on the face of
the bill that it but invoked the authority of the court to ex-
ercise purely probate jurisdiction by administering and settling
the estate of Rios, the estate of his son, and that of the mother,
and, as an incident thereof, to liquidate the community which
had existed between Rios and his wife.  Indeed, such was
exactly the substantive relief which the bill as finally amended
prayed.  As by the bill it is alleged that on the death of the
father and brother probate proceedings concerning both es-
tates had been commenced in the proper Porto Rican court,
it results that not only did the bill seek to administer the
estates through the court below, but it sought also to do so,
although the estates were open in the local court and subject
to the power and authority of such court.  In establishing a
civil government for Porto Rico, Congress, scrupulously re-
garding the local institutions and laws, by § 33 of the act of
April 12, 1900, preserved the local courts, both original and
appellate, and recognized their power and authority to deal
generally with all matters of local concern.  In creating by
the thirty-fourth section of the same act the District Court of
the United States for Porto Rico, the jurisdiction and power
of that court, we think by the very terms of the act, were
clearly fashioned upon and intended to be made, as far as ap-
plicable, like unto the jurisdiction exercised by the Circuit and
District Courts of the United States within the several States
of the Union.  It is true that the jurisdiction of the District
Court, resulting from citizenship, has been made broader than
that conferred upon the Circuit and District Courts of the
United States within the States.  But this does not tend in
any way to establish that it was the purpose of Congress, in
creating the District Court of the United States for Porto
Rico, to endow that court with an authority not possessed by
the courts of the United States (*Farrell* v. *O'Brien,* 199 U. S.
89), to exercise purely probate jurisdiction to administer and
settle estates in disregard of the authority of the local court as
created and defined by law.

By the Porto Rican Code of Civil Procedure (article 62, paragraph 5), power to administer estates, both testamentary and intestate, is vested in the judge of the last place of residence of the deceased. That the power thus conferred is exclusive is shown by the text of the same article and by the comprehensive grant of authority embraced in the provisions of the code which follow, relating to the settlement of both testamentary and intestate successions. That it embraces authority to entertain and dispose of all actions, whether real or personal, necessarily incidental to the accomplishment of the powers granted over estates, is shown by the provisions of article 1001 of the same code. The similarity between the provisions of the Louisiana code as to the community and the analogy which obtains between the provisions of the Louisiana Code of Practice and the Code of Civil Procedure of Porto Rico, concerning the power of the judge or court charged with the administration of estates, whether testamentary or intestate, especially where questions concerning the liquidation of a community, which has existed between husband and wife, is concerned, make pertinent the observations of the Supreme Court of Louisiana in *Lawson et ux.* v. *Ripley,* 17 Louisiana, 238, 248, where it was said:

"The succession of the husband, is therefore so far connected with the community as to form together, at the time of his death, an entire mass called his estate, which is not only liable for the payment of the common debts, but also for the portion of the wife or her heirs to the residue, if they have not renounced. The widow or her representatives have consequently such an interest in the mass of the estate or succession of the husband, with regard to whom no distinction is made between his separate property and that of the community until the net proceeds or amount of the acquets and gains are ascertained, that their assistance at the inventory and their concurrence at all the proceedings relative thereto, which are to be carried on contradictorily with them, are generally required. All such proceedings take place before the court of probates who,

according to law, has exclusive jurisdiction of all the matters concerning the estate, particularly in those cases where it is in a course of administration; and it does not occur to us that separate proceedings can properly be had in relation to the community, until after the settlement of the husband's estate and the payment of the common debts, and division of the residue of the acquets and gains is to be made between the heirs of the deceased and the surviving spouse; and even then the affairs of the husband's estate, administered under the control and supervision of the court of probates, are to be inquired into and sometimes fully investigated."

True it is that by article 1046 of the Porto Rican Code of Civil Procedure the parties interested in an estate which is unsettled and under the dominion of the proper court are given power to terminate the estate by a voluntary agreement between them, and that such may have been the effect of the agreement between the parties here in question if the same was valid. But as the bill charged and the relief which it asked was based upon the conception that the agreement was void, it follows that the relief which the bill sought could only have proceeded upon the hypothesis that the estate had not been closed, and was yet subject to be administered in the proper court. And that this was the theory of the bill is shown by the prayer that the court appoint a master to liquidate and settle the estates.

Coming to consider the subject from the point of view of the averments as to the nullity of the agreement and the fraudulent simulation of the sales, it is clear that the relief sought in this regard was merely ancillary to the prayer for the liquidation and settlement of the estates. As we take judicial notice of the fact that the distinctions between law and equity in a technical sense do not obtain in the local law of Porto Rico, and as under that law a court charged with the administration of an estate is one of general as well as probate jurisdiction and has full power over all personal and real actions

concerning the estate, it follows that the local court had in the nature of things power to determine, as an incident to its general and probate authority, whether the estate had been closed by the agreement, and hence to decide whether that agreement was void, and had also jurisdiction and power to determine whether the property which had been transferred to the mother by the agreement yet remained a part of the estate, and as an incident to so doing to decide the questions of fraud and simulation which were alleged in the bill. Of course, the general scope of the authority which the court then possessed endowed it with the power to liquidate and settle the community which existed between the husband and wife, as that liquidation was of necessity involved in the settlement of the estate. Speaking on this latter subject in *Lawson et ux.* v. *Ripley, supra,* the Supreme Court of Louisiana said (p. 249):

"But it is contended that this would be giving to the court of probates the right of trying questions of title. Probate courts have certainly no power to try titles to real estate, and to decide directly on the validity of such titles; but as this court has said in the case of *Gill* v. *Phillips et al.,* 6 Martin N. S. 298, 'those courts possess all powers necessary to carry their jurisdiction into effect, and when in the exercise of that jurisdiction questions arise collaterally they must, of necessity, decide them, for if they could not no other court could.' And, 'any other construction would present a singular species of judicial power—the right to decree a partition, without the authority to inquire into the grounds on which it should be ordered, or the portions that each of the parties should take.' The end would thus be conceded without the means.' *Baillo* v. *Wilson,* 5 Martin N. S. 217. We are satisfied that whenever a question of title to real property and slaves arises collaterally in a court of probates, and an examination of it becomes necessary in order to give the court the means of arriving at a correct conclusion on matters of which it has jurisdiction, it must take cognizance of such title at least for the purpose of

ascertaining which property belongs to either of the spouses respectively or to the community."

*The decree is reversed and the case is remanded to the court below, with directions to dismiss the bill for want of jurisdiction over the subject matter.*