UNITED STATES v. NATIONAL LEAD CO. et al.

District Court, S. D. New York.

Aug. 24, 1945.

Final Decree Oct. 11, 1945.

514

516

John F. X. McGohey, U. S. Atty. (Herbert A. Berman and William C. Dixon, Sp. Assts. to Atty. Gen., and Julian Caplan, of Detroit, Mich., and Ephraim Jacobs, of Washington, D. C., Sp. Attys., of counsel), for plaintiff.

Bethuel M. Webster and Clifton P. Williamson, both of New York City (Bethuel M. Webster, Clifton P. Williamson, Edward L. Rea, and Carolinda Waters, all of New York City, of counsel), for defendants National Lead Co. and Titan Company, Inc.

Cravath, Swaine & Moore, of New York City (William Dwight Whitney and John Logan O'Donnell, both of New York City, and Gerhard A. Gesell and Nestor Shea Foley, both of Washington, D. C., of counsel), for defendant E. I. du Pont de Nemours & Co.

RIFKIND, District Judge.

By its complaint the United States alleges a cause of action under sections 1 and 2 of the Sherman Act, 26 Stat. 209, 15 U.S.C.A. §§ 1, 2. Its prayer is for an injunction to restrain the alleged violations of the statute and for ancillary remedies to make the court's mandate effective.

The defendants are National Lead Company and E. I. du Pont de Nemours & Company, Inc.,[1] the two principal producers of titanium pigments in the United States and the two largest producers thereof in the world; and Titan Company, Inc., wholly owned by NL and in turn the owner of substantial stock interests in the following corporations, producers of, dealers in titanium pigments: BTP, TG, SIT, TAS and TK.

The complaint charges that:

"Beginning on or about July 30, 1920, defendant National and co-conspirator Titan A/S, and the remaining defendants and co-conspirators, and others to plaintiff unknown, on various dates thereafter, continuing at all times thereafter to the date of the filing of this complaint [June 24, 1944], have been continuously engaged in a combination by the means and methods hereinafter set forth, in restraint of, and to monopolize, the aforesaid trade and commerce in titanium compounds among the several states of the United States and with foreign nations and have been and are now parties to contracts, agreements, and understandings in restraint of such trade and commerce, all in violation of Sections 1 and 2" of the Sherman Act.

The evidence supports the allegation in every material respect.

Titanium is a very abundant element. The principal ores which yield titanium in commercial concentration are ilmenite and rutile. Titanium compounds and particu-

[1] The following abbreviations will be used to identify the defendants and co-conspirators:

| | |
|---|---|
| NL | National Lead Company |
| Tinc | Titan Company, Inc. |
| DP | E. I. du Pont de Nemours and Company, Inc. |
| TP | The Titanium Pigment Company, Inc. |
| Krebs | Krebs Pigment & Color Corporation |
| TAS | Titan Co. A/S |
| IG | Interessengemeinschaft Farbenindustrie Aktiengesellschaft |
| TG | Titangesellschaft, m.b.H. |
| SIT | Société Industrielle du Titane |
| ICI | Imperial Chemical Industries, Ltd. |
| GW | Goodlass Wall and Lead Industries, Ltd. |
| ISC | Imperial Smelting Corporation |
| BTP | British Titan Products, Ltd. |
| NTP or Laporte | National Titanium Pigments, Ltd. |
| CIL | Canadian Industries, Ltd. |
| CTP | Canadian Titanium Pigments, Ltd. |
| Kokusan or KK | Kokusan Kogyo Kabushiki Kaisha |
| TK | Titan Kogyo Kabushiki Kaisha |
| Terres Rares | Société des Produits Chimiques des Terres Rares |
| Thann | Fabriques des Produits Chimiques de Thann et de Mulhouse |
| Montecatini | Societa Anonima Titanium |
| Aussig | Verein für Chemische und Metallurgische Produktion Aussig |

larly titanium dioxide possess the characteristics of opacity, great hiding power, high tinting strength and chemical inertness. These properties make it superlatively suitable for the manufacture of white paint and valuable in the production of rubber, glass, paper and several additional materials.

The commercial development of titanium compounds is founded largely upon the work of three groups of chemists working independently at and about the time of the first World War. In the United States, at Niagara Falls, New York, Messrs. Barton and Rossi developed a process for the manufacture of titanium compounds. Patents were issued to them; and these they assigned to TP, a corporation formed for the purpose. In Norway, Gustav Jebsen and his associates interested in the utilization of a large ilmenite deposit, developed another process. The patents which were granted thereon were assigned to TAS, organized for the purpose of exploiting them.

In France, Joseph Blumenfeld invented and procured patents for a third process. Terres Rares acquired these patents.

In 1920 NL held 10% of the stock of TP and had an option to acquire up to 50% of its stock. NL thereupon negotiated an agreement with TAS which was executed and went into effect on July 30, 1920. This agreement became the basic charter for the world-wide regulation of production and commerce in titanium compounds.

It marked the birth of a new industry. In the course of the ensuing twenty years titanium pigments outstripped the production and sale of lithopone and white lead. In the United States production rapidly mounted and by 1940 more than 100,000 tons of pure $TiO_2$, having a value in excess of $40,000,000 were manufactured and sold. In Europe and other parts of the world, too, the industry took serious hold and production mounted to approximately one third of the United States tonnage. By 1944 American production had risen to 133,000 tons of pure $TiO_2$. Most of the sales were not in the form of pure $TiO_2$ but in the form of extended pigments—that is, pigments composed of $TiO_2$ chemically united or mechanically mixed with other ingredients.

Throughout this period prices were repeatedly reduced and only once, in 1941, increased.

At or about the time of the outbreak of World War II [this point of time is taken arbitrarily] we find this industry predominantly occupied in the United States by two producers, NL and DP, who supplied, in 1939, 73,645 tons out of a total of 82,940 tons. The balance of 9,295 tons is produced by American Zirconium, a licensee of both NL and DP and by Virginia Chemical, a licensee of DP [2]. We further find a complete absence of imports of titanium products from abroad, and complete absence of exports from the United States, except to the countries of the Western Hemisphere.

In order to understand how this condition of affairs came to be, it is necessary to review the provisions of the mentioned contract of 1920 and briefly to relate the history of the persistence of its principles in more than 60 agreements subsequently executed.

The 1920 agreement between TP and TAS provided:

The preamble recited that each of the parties owned and expected to own certain patents and that each desired to obtain rights under the patents owned by the other, within the "licensed field."

"Licensed field" was defined to include all substances consisting of or containing above two per cent. of titanium, or a compound or compounds thereof, unless such substances contained by weight more than five per cent. of a metal other than titanium in its purely metallic state, and all apparatus, methods, and processes useful in the obtainment or manufacture or use of said substances.

TP agreed to grant to TAS and TAS accepted a license, exclusive of all others including TP, to manufacture, use, and sell each and every invention improvement, or subject matter in the licensed field, under existing or future letters patent; but only in or for territories outside of North America and South America.

TAS agreed to grant to TP and TP accepted a license, exclusive of all others, including TAS, identical in scope and extent except that it was limited to and for the territories within North America (defined to include Central America and Panama).

---

[2] American Zirconium and Virginia Chemical engaged in the production of only pure $TiO_2$. Of extended titanium pigments, NL and DP produced 100% of the amount consumed in the American market.

Each party granted the other a non-exclusive license to use or sell, under patents issued by South American countries, but only in South America.

The parties agreed to make available to each other copies of patent applications; and detailed provision was made for the prosecution of patent applications and the maintenance of patents within the territory of each party respectively.

Each party agreed never to question the validity of the patents of the other.

TAS appointed TP its sole agent for the introduction into and sale in North America of *all products of TAS in the licensed field*. Such importation into the United States could take place only upon the order of the agent; and the sales in North America were to be made at prices and upon conditions fixed by the agent.

TP similarly appointed TAS its sole agent for introduction and sale, outside of North and South America, of all TP products in the licensed field.

Each party was permitted to import into the territory of the other finished articles, such as paint, glass, rubber, in which a titanium product had been used as a raw material—but only when the titanium product did not constitute such an important part of the finished article that its sale would substantially interfere with sales of its own products by the other party within its own territory.

Each party agreed to impart to the other full and accurate technological information relating to the licensed field, and to permit plant inspection (exclusive of research laboratories).

Article XIV of the agreement conferred upon each party the right to grant licenses under its own patents or sublicenses under the other's patents, on condition that every such licensee or sublicensee would

a) grant to the party to the 1920 agreement, other than its licensor, exclusive licenses under all its patents, present and future, in the licensed field, identical in character, territorial scope, and duration to the rights granted by the 1920 agreement by the parties thereto;

b) appoint such other party its sole agent on the same terms as obtained between the parties to the 1920 agreement;

c) would impart to such other party technological information to the same extent as obtained between the parties to the 1920 agreement;

d) would abide by the territorial allocation of the 1920 agreement.

The agreement of 1920 was to continue in effect until 1936, and was then to be automatically renewed for successive ten year periods, each party having the right to cause a termination by notice given at least five years before the end of such period.

By an agreement executed simultaneously with TP and TAS, NL bound itself to respect the contract of 1920, promptly to assign to TP all its then owned or thereafter acquired patents, inventions and improvements relating to the licensed field, throughout the world, and to communicate to TP all its technical information in the licensed field.

It is manifest that by the terms of this agreement the parties had divided the world into two trade areas or territories; that each party agreed not to trespass into the territory allotted to the other; and that all commerce between the two territories in titanium products was, as far as these parties were concerned, interdicted and could proceed only by the grace of their mutual consent. The suppression of this commerce was not limited to patented articles or to articles produced by patented processes but extended to all products within the "licensed field."

The objects of this arrangement have not been left unstated, to be ascertained by inference and deduction. They are disclosed by a large volume of written correspondence, uninhibited by any respect for, or indeed any apparent awareness of, the prohibitions of the anti-trust laws.

These explicitly stated objects are: 1, the elimination of competition; 2, the advancement of the art through the exchange of technology. It was the belief of the architects of this foundation of the industrial structure they hoped to build thereon, that the second object could not be attained except in a climate of cooperation engendered by the achievement of the first object. And it was their intention that the advance in the art, accelerated by the exchange of patents, patent applications and "know-how," should as far as possible remain the private prize of the parties, and constitute their shield and weapon against outsiders.

This intention was carried into effect.

An examination of the evidence reveals the perpetuation of what the parties called

the principles of the 1920 contract by a network of agreements which have confined the international trade in titanium products within the preordained channels wherethrough it moves only by the grace and under the regulation of NL and its foreign associates. It is unnecessary to rehearse the history and detail of that development. Both are recited in the Findings of Fact. A very brief summarization is all that will be attempted here.

In 1927 NL acquired 87% of the stock of TAS. Jebsen retained 13%.

In 1929 NL organized Tinc, which thereupon acquired the rights and assumed the liabilities of TAS under the 1920 Contract. Tinc became NL's corporate pocket for the deposit of its holdings in foreign titanium enterprises. By 1932 NL had acquired all of the stock of TP and in 1936 it acquired all its assets and assumed its obligations.

On May 1, 1925, by agreement between TAS and French interests, SIT, a French corporation, was established to manufacture and distribute titanium products but only within the territory of France and its colonies (except those appurtenant to North and South America). Both TAS and NL acquired substantial interests in SIT. On March 3, 1927, the arrangements between TAS and SIT were confirmed and elaborated to give explicit expression to the provisions of the 1920 Contract relating to territory, competition and technological collaboration.

In 1927, by agreement between TAS (acting also in behalf of and in the interest of NL) and IG, a German corporation was established, called TG. IG and TAS became the joint owners of TG. IG agreed that it would not engage in the titanium business except through TG, to whom it assigned all its titanium patents and to whom it agreed to assign all its future titanium patents. To TG was assigned a territory consisting of Germany, Russia, Austria, Hungary, Czechoslovakia, Switzerland, Roumania, Serbia, Croatia, Slovenia, Bulgaria, Greece, Turkey, Japan, China, and Spain. TAS and TG simultaneously entered into an agreement which embodied the principles of the 1920 Contract.

NL was in good part motivated in bringing about these German agreements by the desire to be free of the potentially very dangerous competition of so powerful a producer as IG. The evidence is incapable of any other inference.

By 1933 NL was acting in the foreign field through Tinc. By a series of agreements entered into in February and March, 1933, production and distribution of titanium products within the British Empire (exclusive of North and South America) were brought within the orbit and subjected to the regulation of the principles of the 1920 Contract. The agreements were among Tinc, ICI, ISC and GW. Pursuant to these agreements BTP was formed and became the assignee and licensee of existing and future titanium patents of the parties to the agreement; it also became subject to and beneficiary of the principles of exclusive territorial allocation and patent and technological collaboration of the 1920 Contract.

Meanwhile, significant events were taking place within the sphere of relations between the producers already mentioned and other producers, both American and foreign, whose processes stemmed from the inventions of Joseph Blumenfeld. But I shall depart from the chronological order in order to complete the recitation of events pertinent to the producers whose processes were rooted in the Barton and Jebsen Rossi inventions.

Canada was NL's territory under the 1920 Contract. But danger of independent competition in that market developed from the plans of Laporte. In 1937, NL and CIL entered into agreements for the formation of CTP, to whom Canada was assigned as its exclusive territory. CTP became the beneficiary of all present and future titanium patents of both its founders. It was subjected to the restrictions and given the benefits of the principles of the 1920 Contract. The threat of Laport's competition was eliminated by an agreement under which Laporte's Canadian business and patents were purchased and Laporte covenanted to stay out of the titanium business in Canada for 15 years.

In 1936, Tinc, IG and TG, a Blumenfeld company, TR and a Japanese company, KK, joined in the formation of TK to engage in the manufacture and sale of titanium products. The territory assigned to TK was the Japanese Empire. This agreement departed in some respects from the principles of the 1920 Contract but it adhered strictly to the principles of exclusive territorial allocation and the elimination of competition between territories. In the new Japanese company ownership was divided as follows: 50% to KK; of

the remaining 50%, TR got 30% and Tinc and IG 70%. This division of interest between Tinc and IG on one side and the Blumenfeld companies on the other was dictated by agreements previously entered into which need now to be briefly mentioned.

It has already been stated that Joseph Blumenfeld had assigned his titanium patents to TR. TR in turn assigned or licensed them to Aussig of Czechoslovakia, Montecatini of Italy, Thann of France, Laporte of Great Britain and Commercial Pigments of the United States, who severally were engaged in the production of titanium products and exploited various markets in competition with the producers already mentioned, who utilized the Barton-Rossi and Jebsen processes. Beginning in 1933, a series of agreements were negotiated and executed, the object of which was to bring this competition under the control of the parties.

i. The first of these was the Aussig agreement, made in 1933, by TG and Aussig. This agreement regulated production, territory of sale, sales quotas, prices and patent exchange.

ii. The Contrat a Quatre was executed in 1935 to take effect as of May 1, 1934. The parties were Thann and TR on one hand, and SIT and Tinc on the other. It regulated sales quotas, prices and patent exchange.

iii. The Contrat de Livraisons was executed in 1935 by the same parties. To prevent the expansion of producing capacity, the contract provided that each would supply the other with its surplus product to satisfy the other's deficiency.

iv. The Contrat a Six was executed at the same time. The parties were Thann, TR, Montecatini, Tinc, SIT, and TG. It regulated sales-territories and sales-quotas of each of the parties. All the parties agreed to give neither technical nor commercial assistance or assign any patent or grant any license to any outsider who intruded into the territories covered by the agreement. This agreement was renounced by Montecatini on December 31, 1938.

v. The British Empire was not embraced within the aforementioned agreements.

Sometime in 1936, BTP and Laporte entered into agreements whereby Laporte withdrew from the world market outside the British Empire and uniform prices were established in the British market. In 1941, BTP entered into a quota arrangement with Laporte, establishing 80% as BTP's share and 20% as Laporte's share of the British market.

I return now to the United States and take up the thread of the story in 1931. Since this aspect of the case will require more detailed analysis, I shall but sketch its outlines to serve as a frame of reference for the discussion which is to follow. As already indicated, Commercial Pigments held the American rights under the Blumenfeld patents. Until 1931, the company engaged in manufacturing and selling pure $TiO_2$. In 1931, these rights were acquired by Krebs, a corporation organized by DP and Commercial Solvents Corporation. DP acquired 70% of the stock of Krebs. Krebs manufactured and sold titanium compounds until 1935, when DP acquired all its assets. Thereafter and to date, DP engaged directly in manufacture of titanium compounds. After a protracted period of negotiation between NL and DP, their respective titanium subsidiaries TP and Krebs entered into a written agreement, dated January 1, 1933, which was executed in July of 1933. By the terms of this agreement they

i. exchanged irrevocable, non-exclusive licenses, within the United States, to use all processes, methods, and apparatus relating to or in the "licensed field," [3] whether or not patented or subject to patent, then or thereafter owned by them or otherwise at their disposal, with the right to sell products resulting from the exercise of such licenses in the United States, its colonies and possessions, Mexico, Central America, the West Indies and South America;

ii. agreed to exchange technical information and experience;

iii. agreed to assist each other to acquire an irrevocable, non-exclusive license, for the territory above described, under any patent or application owned by or otherwise at the disposal of third parties, under which one of them was itself licensed; and Krebs agreed that it would offer to any foreign

[3] "Licensed field" was defined to mean "(1) all methods, processes and apparatus in the field of manufacture and use of all titanium compounds, containing two per cent. (2%) or more of the element titanium in a chemically, mechanically or physical- ly combined state, and mixtures thereof, which can be used as pigments, whether or not adapted for other uses, and (2) all such titanium compounds and mixtures which can be used as pigments, whether or not adapted for other uses."

associate of TP, before offering to any other person, the opportunity to acquire, upon mutually satisfactory terms, an irrevocable, non-exclusive license under any patent, then or thereafter owned or at the disposal of Krebs, relating to the "licensed field," issued in any country of Europe or in Great Britain;

iv. released each other from infringement claims;

v. agreed that the agreement might be terminated after December 31, 1933, on three years notice.

Before this agreement was executed there was an exchange of oral and written communications between NL and DP, of which more will be said hereafter. It is sufficient to indicate at this point that the DP agreement departed in several important respects from the requirements of Art. XIV of the 1920 Contract.

In each of the years 1937 to 1941, inclusive, DP and Tinc entered into agreements whereby DP granted to Tinc licenses, exclusive except as to DP, under specified titanium patents and applications of DP, in specified countries, with the right to grant sublicenses to TG, BTP, SIT and from 1939, to TK; and Tinc, with the consent of NL, granted DP non-exclusive licenses under specified United States patents and applications.

On or about May 1, 1940, the exchange of technical information between NL and DP was discontinued; and by agreement of January 1, 1941, the 1933 agreement was amended accordingly.

As already noted, there are in the United States only two other producers of titanium products, American Zirconium and Virginia Chemical.

American Zirconium began the manufacture of titanium compounds in 1934. NL and DP severally notified American Zirconium that it was probably infringing. On May 6, 1935, NL (through TP) entered into an agreement with American Zirconium for the cross-licensing of patents. The agreement in all material respects embodied the principles of the 1920 Contract. In lieu of royalties NL received 10% of the stock of American Zirconium.

In April, 1944, the agreement was cancelled and NL assigned its American Zir-conium stock to the latter's parent corporation.

In July, 1935, DP and American Zirconium entered into an agreement dated January 1, 1935, whereby DP granted American Zirconium a non-exclusive license under specified patents, subject to a royalty on the "total quantity of titanium dioxide produced" and subject to a quantity limitation on the tonnage of "titanium dioxide made wholly or partly under the license." The quantity limitation was graduated from 3,000 tons at the inception of the contract to 9,000 tons in 1944 and thereafter. The limitation was from time to time somewhat relaxed and was cancelled on November 10, 1944, on recommendation of DP's Legal Department.

Virginia Chemical received a license from DP on August 5, 1937. Its terms were substantially similar to those of the American Zirconium license.[4] The quantity limitations were eliminated at the same time and under the same circumstances as the corresponding change was made in the license to American Zirconium.

This concludes the barest outline of the history of the titanium industry. In detail, the elapsed quarter century is crowded with negotiations, conferences, correspondence and agreements. The men who participated in these were all articulate, literate and, with the exception of DP's Rupprecht, recorded what they saw, heard, said and thought with Boswellian fidelity. When the story is seen as a whole, there is no blinking the fact that there is no free commerce in titanium. Every pound of it is trammelled by privately imposed regulation. The channels of this commerce have not been formed by the winds and currents of competition. They are, in large measure, artificial canals privately constructed. The borders of the private domain in titanium are guarded by hundreds of patents, procured without opposition, and maintained without litigation. The accumulated power of this private empire, at the outbreak of World War II, was tremendous. It was more difficult for the independent outsider to enter this business than for the camel to make its proverbial passage through the eye of a needle.

For the purpose of the discussion which follows, it is convenient to segregate DP's

---

[4] Virginia Chemical also licensed DP under one of its patents and applications. TiO$_2$ produced by Virginia Chemical by the process disclosed in this patent and application was expressly exempted from the quantity and royalty provisions.

relations with NL and the foreign producers from NL's relations with the foreign producers.

## I. The Case Against NL and Tinc.

At the outbreak of World War II we find that NL and Tinc are, by virtue of agreement, members of a world-wide combination. The more intimate members of that combination are NL, Tinc, TAS, SIT, TG, BTP, TK and CTP. Among these, the closest cooperation prevails. Territories are allocated; patents and patent applications are interchanged and cross licensed; technological information or "know-how" of one is promptly made available to the others (except TK). Each operates in its own exclusive territory. When there is suspicion that a customer of one is shipping into the territory of another, investigation is promptly made with a view to suppressing the "illicit" traffic. Competition among them is non-existent.

A less intimate bond unites the members of this Titan family with the Blumenfeld group. No member of the latter group exports into NL's exclusive territory. NL does not export outside of the Western Hemisphere. For the territory beyond NL's frontiers, quota arrangements and price agreements assure the absence of competition between the Titan family and the Blumenfeld group. In Japan both groups unite in a common enterprise.

And all this is the product of agreements.

Clearly this combination affects the interstate and foreign commerce of the United States. No titanium pigments enter the United States except with the consent of NL. No foreign titanium pigments move in interstate commerce except with like approval. No titanium pigment produced by NL may leave the ports of the United States for points outside the Western Hemisphere.

One of the objects of the combination is to suppress competition.

On January 12, 1927, the president of NL writes to Evans McCarty, its vice-president, and one of the chief architects of the combination:

"The titanium patents expire in 1936 unless extended in ways not at present known to us. * * * Therefore, with us in the United States and with the Norwegian Company, there is a common need to exploit titanium pigments and, at the same time, protect ourselves; so that after the expiration of patent rights, we may have

the manufacture and sale thereof under our control so as to continue to reap the harvest from the seed we are now sowing. If you, therefore, could formulate a plan satisfactory to Dr. Jebsen, whereby we could arrange to pay a royalty to the Norwegian Company similar to that he proposed to ask from the German Company, under an agreement that the National Lead Company would endeavor to organize companies in Germany, England and such other European countries as it desired—in each of which companies the National Lead Company should acquire and own at least one-half of the capital stock outstanding—I would personally look with favor upon such an arrangement." (Pl.Ex. 70.)

On April 27, 1932, Jebsen writes to Major Barley, of Imperial Chemical Industries, Ltd., proposing the formation of a British company in keeping with the suggestion of NL's president. Therein he refers to the 1920 Contract and adds:

"In order to avoid competition and friction, it was agreed that each company should confine its activity of manufacture and sales to a definite territory." (Pl.Ex. 112.)

Prior thereto, on September 16, 1930, Jebsen reported to McCarty concerning the early conversations with Aussig:

"I presented for discussion your suggestion of a pooling of the patents. It is not quite clear to me what is meant by this. We thought, however, that the idea was mutual cooperation and possible joint action to keep third parties out." (Pl.Ex. 522.)

He pointed out a number of obstacles in the path of such a scheme—but these were in fact overcome.

In April, 1931, Cornish, president of NL, finds himself obliged to contribute to the correspondence by reason of McCarty's illness. The subject under discussion is apparently the proposed arrangement with the Blumenfeld companies:

"May I call the proposed combination, for simplicity, a cartel?"

And he defines it.

"The whole purpose of the cartel is to obtain a monopoly of patents so that no one can manufacture it excepting the members of the cartel, and so can raise the prices by reason of such monopoly to a point that would give us much more profit on our present tonnage, but also prevent a growth in tonnage that would interfere

with their greater profits in lithopone." (Pl.Ex. 183.)

He voices objections based on business, not legal, grounds. His objections, however, were apparently not pressed.

Such was the purpose for which, and such were the means by which, NL, McCarty and Jebsen built their closed system. To have access to the patents of the combination, the stranger must not only have the consent of the member of the combination in whose "territory" he would operate, but he must adhere to the principles of the combination. The cornerstone of the system was the private regulation of international trade. The suppression of competition was the cement which held the superstructure in place.

■ Whether the form of association they created be called a cartel,[5] an international cartel, a patent pool, or "a technical and commercial cooperation," is of little significance. It is a combination and conspiracy in restraint of trade; and the restraint is unreasonable. As such it is outlawed by Section 1 of the Sherman Act; and it is unimportant whether it also violates Section 2.

■ No citation of authority is any longer necessary to support the proposition that a combination of competitors, which by agreement divides the world into exclusive trade areas, and suppresses all competition among the members of the combination, offends the Sherman Act. Hence we need only consider the adequacy of the defenses asserted against the case established by the plaintiff.

■ The system of territorial allocation and suppression of trans-Atlantic traffic in titanium compounds and pigments cannot be justified as ancillary to the grant of a license under a patent. True, the network of agreements did involve cross-licensing

[5] The attorney for the United States has suggested the following definition: "A combination of producers of any product joined together to control its production, sale and price, and to obtain a monopoly in any particular industry or commodity."

Words and Phrases (Permanent Edition) contains no definition of the word; neither does the Federal Digest. Bouvier's Law Dictionary defines cartel thus: Agreements between belligerents authorizing certain nonhostile intercourse between one another, which would otherwise be prevented by the state of war.

In Monograph No. 1, of the Subcommittee on War Mobilization of the Committee on Military Affairs, U. S. Senate, 78th Congress, 2d Session (commonly called the Kilgore Committee) the following is presented:

"Cartels have been defined by two of the foremost members and advocates of such bodies. In the words of Sir Alfred Mond, organizer of Imperial Chemical Industries:

" 'I use the word cartel to include fusion, pooling arrangement quota arrangement and price convention, because a cartel is protean in its form. * * * In an ultra-technical way, a cartel might be defined as a combination of producers for the purpose of regulating as a rule, production, and, frequently, prices. That does not involve giving up the identity of the different firms. It is not usually made for a period lasting more than a limited time. It does not necessarily carry with it, though in some cases it does, joint selling agencies. Sometimes, too, it carries with it quotas of production. But all this is, perhaps, too narrow a definition. The

Germans have a term Interessen-gemeinschaft * * * a union or similarity of interest. The great German Dye Trust started with what they call Interessen-gemeinschaft. When first formed it was a fairly loose combination to regulate production and prices. It has been substituted since by an absolute and complete fusion and exchange of shares—what we should call a complete amalgamation—which is the final and most complete form of any kind of cartel which can be imagined.'

"In the words of Sir Felix J. C. Pole, chairman of Associated Electrical Industries, Ltd.:

" 'A cartel or association usually means an association by agreement of companies or sections of companies having common interests. It is designed to prevent extreme or unfair competition and allocate markets, and it may also extend to interchange of knowledge resulting from scientific and technical research, exchange of patent rights, standardization of products, etc. Competition is not eliminated, but it is regulated. Competition in quality, efficiency, and service takes the place of the crude method of price cutting.'

"These quotations both emphasize the central fact that cartel activities are arrangements among business enterprises engaged in the same type of industry to avoid some or all forms of competition. Cartel activities are designed to maximize the profits of participants by directly or indirectly maintaining prices at the level of greatest net return.

"International cartels are, of course, cartels which include business enterprises

of patents—but it was not limited thereto. The agreements applied to patents not yet issued and to inventions not yet imagined. They applied to commerce beyond the scope of any patents. They extended to a time beyond the duration of any then-existing patent. Ethyl Gasoline Corporation v. United States, 1940, 309 U.S. 436, 456, 60 S.Ct. 618, 84 L.Ed. 852. They embraced acknowledgment of patent validity with respect to patents not yet issued, nor applied for, and concerning inventions not yet conceived. Pope Mfg. Co. v. Gormully, 1892, 144 U.S. 224, 12 S.Ct. 632, 36 L.Ed. 414; United States v. Hartford-Empire Co., D.C.N.D.Ohio, 1942, 46 F.Supp. 541, 615. They extended to countries, such as China, where no system of patent monopolies exists. Interstate Circuit, Inc., v. United States, 1939, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610. They regulated the disposition of the products after sale by the licensees. United States v. Univis Lens Co., 1942, 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408; United States v. Bausch & Lomb Optical Co., 1944, 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024.

■ While it has been held that the owner of a patent may license whom he will or refuse to license, Continental Paper Bag Co. v. Eastern Paper Bag Co., 1908, 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122, it is now well settled that a license may not be used to extend the patent monopoly beyond its terms. Morton Salt Co. v. Suppiger Co., 1942, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363; Ethyl Gasoline Corporation v. United States, 1940, 309 U.S. 456, 60 S.Ct. 618, 84 L.Ed. 852. And where there is a refusal to license (or refusal to license except on specified conditions which would extend the patent monopoly) which is the product of agreement or conspiracy, on the part of the owners of competing patents, I believe, the law is offended to the same extent as the law is violated when several combine and agree not to do business with a particular customer or class of customers. United States v. Colgate & Co., 1919, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, 7 A.L.R. 443; United States v. A. Schrader's Sons, Inc., 1920, 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471; United States v. Waltham Watch Co., D.C.S.D.N.Y.1942, 47 F.Supp. 524, 531. The agreements here involved offend in that respect, as well.

■ It is suggested that the 1920 Contract may escape the condemnation of the Sherman Act by recourse to the doctrine which validates covenants in restraint of trade when reasonably ancillary to a lawful principal purpose, such as the sale of a business. United States v. Addyston Pipe & Steel Co., 6 Cir., 1898, 85 F. 271, affirmed 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136. Such a principal purpose is, in the case at bar, supposed to be the sale by TAS of its American business to TP, accompanied by a license under its patents; and conversely, the sale by TP of its foreign business to TAS, accompanied by a license under its patents.

The shortest answer to this suggestion is that, in fact, TAS had no American business to sell, and that TP had no foreign business to dispose of. At best, each had an opportunity and a hope. Certainly the world-wide territorial allocation was unreasonable in scope when measured against the business actualities. This is a case where if not the sole, at least one of the principal, objects was "to restrain trade in order to avoid the competition which it has always been the policy of the common law to foster." United States v. Addyston Pipe & Steel Co., 6 Cir., 1898, 85 F. 271, 282, 283; Greater New York Live Poultry Chamber of Commerce v. United States, 2 Cir., 1931, 47 F.2d 156, certiorari denied 283 U.S. 837, 51 S.Ct. 486, 75 L.Ed. 1448.

In each of the subsequent agreements which resulted in the creation of SIT, TG, BTP, CTP and TK, the same purpose, to restrain trade in order to avoid competition, was paramount.

■ It is suggested that this Court is without jurisdiction to consider conduct abroad, on part of foreign corporations, relating to the commerce of foreign nations. Unquestionably, if the gravamen of the complaint were to impeach the Aussig agreement as such, or the BTP-Laporte quota arrangement as such, the point would be well taken. But that is not the gist of the complaint. On the contrary, it has been alleged and proved that a conspiracy was entered into, in the United States, to restrain and control the commerce of the world, including the foreign commerce of the United States. The several agreements relating to manufacture and trade within the European markets are but some of the

domiciled under more than one government and doing business across national frontiers. A cartel of this type may include the major enterprises operating in a given industrial field throughout the world, and may determine trade policies in that field in most, if not all, of the world's principal markets."

links in the chain which was designed to enthral the entire commerce in titanium. The object of the government's attack is a conspiracy in the United States affecting American commerce, by acts done in the United States as well as abroad. It follows that the Sisal case [6] rather than the Banana [7] case is the pertinent analogue.

■ The argument has been advanced that this court cannot invalidate contracts with parties who are not within the court's jurisdiction and amenable to its order.[8]

The absence of NL's foreign associates will, of course, place a practical limitation upon the scope of the court's decree; it does not prevent the court from finding a violation as the facts warrant, and from restraining those within the reach of its mandate from continuing a conspiracy in defiance of the Sherman Act.

■■ It is suggested that plaintiff has failed to establish injury to the public interest, Appalachian Coals, Inc., v. United States, 1933, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825; and that the defendants have proved substantial public benefit.[9] The latter proposition, defendants derive from two lines of evidence. The first is that

during the regime of the combination, the art has rapidly advanced, production has increased enormously and prices have sharply declined. The evidence does show as much; but it does not follow that the public interest has not been abused. Indeed, the major premise of the Sherman Act is that the suppression of competition in international trade is in and of itself a public injury; or at any rate, that such suppression is a greater price than we want to pay for the benefits it sometimes secures. Nor does it necessarily follow that the advance of the art, the rise in production and the decline of prices are attributable to the effects of the combination. Post hoc, propter hoc, is an invalid argument whether used by the plaintiff or the defendant. Anyone is free to speculate whether, in the absence of the arrangement, the stimulus of competition might not have produced far greater strides in these beneficial directions. The economic theory underlying the Sherman Act is that, in the long run, competition is a more effective prod to production and a more trustworthy regulator of prices than even an enlightened combination.

■ The second line of evidence is that

---

[6] United States v. Sisal Sales Corporation, 1927, 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042.

[7] American Banana Co. v. United Fruit Co., 1909, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826, 16 Ann.Cas. 1047.

[8] Shields v. Barrow, 1854, 17 How. 130, 15 L.Ed. 158; State of Minnesota v. Northern Securities Co., 1902, 184 U.S. 199, 22 S.Ct. 308, 46 L.Ed. 499; Garzot v. De Rubio, 1908, 209 U.S. 283, 28 S. Ct. 548, 52 L.Ed. 794; United States v. Northern Pacific R. Co., 8 Cir., 1905, 134 F. 715; Cf. United Shoe Machinery Corp. v. United States, 1922, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708.

Whatever may be the scope of this rule, it has not interfered with the action of the courts in striking down systems deemed violative of the anti-trust laws even though such systems included leases, licenses, and other forms of agreements, and the lessees, licensees, and other parties to the agreements were not before the court. Paramount Famous Lasky Corporation v. United States, 1930, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145; Interstate Circuit v. United States, 1939, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610; Ethyl Gasoline Corp. v. United States, 1940, 309 U.S. 436, 60 S.Ct. 618, 84 L. Ed. 852; United States v. Univis Lens Co., 1942, 316 U.S. 241, 62 S.Ct. 1088,

86 L.Ed. 1408; United States v. Hartford-Empire Co., 65 S.Ct. 815.

Nor were these all cases like United Shoe Machinery Corp. v. United States, 1922, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708, where the enjoined covenants were all for the benefit of the lessor, and the injunction did not adversely affect the lessees. Paramount Famous Lasky Corporation v. United States, supra; Interstate Circuit v. United States, supra; Ethyl Gasoline Corporation v. United States, supra.

Were the rule advocated by NL allowed to operate in the field of restraints upon the foreign commerce of the United States, it would paralyze the enforcement of the law in all cases where one or more of the parties to the conspiracy was an alien corporation over whom the court could acquire no personal jurisdiction. The courts do not so readily permit a frustration of valid national policy. The flexibility of the decree which the court can frame allows for a great degree of accommodation. An example of that is J. I. Case Co. v. N. L. R. B., 1944, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762.

[9] This argument is distinct from the "good intention and noble motive" argument which was rejected in Thomsen v. Cayser, 1917, 243 U.S. 66, 85, 37 S.Ct. 353, 61 L.Ed. 597, Ann.Cas.1917D, 322.

American producers cannot do business successfully in a cartelized world except on cartel terms; and that, to abstain from such business, would amount to a greater restraint on trade than is involved in joining the cartel; see, Cartels: What Shall We Do About Them? Milo Perkins, Harper's Magazine, November, 1944. The validity of this argument has been the subject of congressional inquiry: Temporary National Economic Committee, 76th Congress, Monograph No. 40; Economic and Political Aspects of International Cartels, Committee on Military Affairs, U. S. Senate, 78th Congress, 2d Session. That kind of inquiry, rather than a judicial one, is appropriate to the evaluation of the merits of the proposition. For the courts it is conclusive that Congress has not yet validated such a solution to the problem. Until it does, private agreement and combination and private regulation may not substitute for legislation. Only Congress, not the courts, may grant the required immunity.

■ It is suggested that the truly vital issues of this case have become moot by the intervention of war with Germany, Japan and Italy; and that the complaint should be dismissed. Reliance is placed upon United States v. Hamburg-Amerikanische Packet-Fahrt-Actien Gesellschaft, 1916, 239 U.S. 466, 36 S.Ct. 212, 60 L.Ed. 387. Several reasons dictate the rejection of this argument.

(1) The Hamburg case rests upon its own peculiar facts. The offending contract had come to an end by its own terms; as far as the Germans were concerned, it had also terminated by reason of war; and as far as the others were concerned, by the withdrawal of the Germans. United States v. Aluminum Company of America, 2 Cir., 148 F.2d 416, 448. "Besides, the contract was of such a kind that the exclusion of the German lines probably made impossible the realization of its purposes in any part." Id. In the instant case, the contracts with the Germans had not expired by their terms; and, at least to the moment of America's entry into the war, the parties did not intend or expect that war should or would involve a permanent divorce.

(2) This case abounds with evidence that the parties foresaw the possibility of interruption causa belli and made provision for dealing with the interlude and for resumption thereafter. At least this can be said with complete assurance that until the entry of the United States into the war, the contracting parties regarded the war as a temporary interruption, for which they would, after cessation of hostilities, make adjustments in a spirit of fairness and amity.

Peculiarly revelatory in this connection is plaintiff's Exhibit 512. It is the draft of a letter preserved in the files of Tinc, entitled, "Draft of letter from Titan Co., Inc. to be sent later, presumably after the war, to: I. G. Farbenindustrie, Titangesellschaft, British Titan Products Company and Ste. Inc. du Titane." The letter reports the amendment of January 1, 1941, to the NL-DP agreement of 1933, explains that war conditions rendered consultation with the addressees impractical and expresses a desire for their approval. When this was written, the United States was not at war; but England, France, Germany, and Italy were at war. One can not read Exhibit 512 without sensing the expectation, indeed the assumption, that the war may have interrupted the execution of the several agreements among the parties, it had not permanently disarranged the relations of the parties, and that the return of peace would bring a resumption of the established "cooperation". Much other evidence points in the same direction; and none of the evidentiary material created ante litem motam points in a conflicting direction. Upon the trial in the midst of war, the future resumption of relations with the Germans was emphatically repudiated.

The inference I draw is that there is a preponderant probability that the underlying combination or conspiracy persists and that, but for these proceedings, would resume the exercise of its restraining force on commerce to the extent that international conditions permitted.

(3) That some of the contracts have been terminated by war, it seems to me, is of relatively little significance. For in a legal sense we mean no more thereby than that the contracts have become unenforcible. But these contracts, being in restraint of trade and violative of the anti-trust laws, were never enforcible. If the non-enforcibility of the contract were to render an action under the anti-trust laws moot, we would face the absurd result that only innocent combinations would remain available for judicial scrutiny.

It is suggested that the validity of the British and Canadian contracts has become moot by the application of the doctrine that

cancellation or abandonment of provisions of a contract prior to final decree renders the question of the validity of such provisions moot. Standard Oil Co. v. United States, 1931, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926; United States v. United States Steel Corporation, 1920, 251 U.S. 417, 445, 40 S.Ct. 293, 64 L.Ed. 343, 8 A.L.R. 1121.

 It should be noted that the authorities do not justify the statement of the rule in quite such broad terms. United States v. Trans-Missouri Freight Ass'n, 1897, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007; United States v. Sugar Institute, Inc., S.D.N.Y.1934, 15 F.Supp. 817, modified 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859. Injunctions, of course, relate to future conduct. The formal cancellation of a contract, or of a provision of a contract is a fact to be considered in determining whether, under all the circumstances, the unlawful action of the past is likely to recur in the future; the issue is the likelihood of continuance. Swift & Co. v. United States, 1905, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518.

The facts in the instant case with respect to the British and Canadian contracts are briefly these. At a pretrial conference held in this case on October 30, 1944, counsel for NL called attention to the existence of a new form of contract, then in a state of negotiation between NL and the British companies. At the trial, a copy of such a proposed agreement, not yet executed by the parties, was received in evidence. The named parties were ICI, ISC, GW, Tinc, BTP and NL. Similarly, there was testimony that negotiations were in progress among NL, CIL and CTP to revise the Canadian agreements.

 This evidence shows that there is a disposition on the part of defendants NL and Tinc to abandon illegal practices; it does not rise to the dignity of proof of abandonment. Nor is it necessary to recite here the precise changes which the parties are willing to introduce into their relations. To my mind these proposed agreements amount to little more than a statement of what defendants are willing to accept. Apparently, execution of the new agreements is awaiting some word of approval by the court. It seems, under the circumstances, that it would be more appropriate to examine them in connection with the framing of a decree, rather than as bearing on the question whether any decree is to be made for injunctive relief.

This branch of the case may be briefly summarized thus:

 Agreements creating a world-wide patent pool of all present and future patents of the parties, covering an entire industry, and embracing a division of the world into exclusive territories within which each of the parties is to confine its business activities, with respect to patent protected commodities, as well as unpatented, for the purpose and with the effect of suppressing imports into and exports from the United States, are unlawful under the Sherman Act; they constitute an unreasonable restraint of trade.

## II. DP's Part in the International Cartel.

 As to DP, the facts are by no means as clear. Stoutly it denies any complicity in the combination; and much of the evidence supports its denial. It did not subscribe to the 1920 agreement; the agreement it did sign, in 1933, deviated sharply from the form and from the principles of the 1920 agreement. In 1940, it withdrew from the exchange of technological information with NL. It competed with NL for the American market. It was never regarded by the Titan group as a full fledged member of their family. Its anomalous position was the subject of frequent discussion and apprehension among the Titan members, and efforts were made to convert DP into a fully conforming member.

In sharp contrast with NL, DP exhibited, from the very beginning of its interest in titanium, an alert consciousness of the anti-trust laws and moved cautiously and under the guidance of trained anti-trust lawyers. The question is whether it succeeded in avoiding not only the form but also the substance of transgression. I have concluded that it has not; and I arrive at that conclusion by the following analysis of the facts:

DP was manifestly eager to obtain access to NL's patents and skill in the titanium field. NL was equally eager to grant such access. NL's motives for this eagerness are not too important. It matters little whether it sought the reciprocal advantage of DP patents and research; or whether it feared DP's hostile competition more than it feared its friendly, though competitive, collaboration; or whether it anticipated that NL and DP together would constitute an alliance so formidable as to preclude any other important competition. Whatever its

motive, NL was willing; but its liberty of action was sharply circumscribed by the agreement of 1920. That required that, before NL could license DP under its patents, DP must adhere to the principles of the 1920 agreement. Such adherence, DP refused. The reasons assigned by DP for its refusal were several, and varied from time to time, but always conspicuous among them was the claim that its adherence was forbidden by the anti-trust laws.[10] In this troubled atmosphere, the 1933 agreement was drawn, after long negotiation, by lawyers who were aware of the then recent decision in the Gasoline Cracking case. Standard Oil Co. v. United States, 1931, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926.

Carefully, they cast the agreement into the form of a settlement of patent disputes. The disturbing fact about that instrument is that despite the high professional skill expended upon it, its terms are, in important respects, so vague that upon the trial, counsel for NL and counsel for DP did not agree upon its meaning. It is clear, and I believe not disputed, that the 1933 writing is far from the lawyer's ideal of clarity and precision. The only explanation which the record affords for this unexpected obscurity is contained in a letter from Mr. Beschorman to NL's English associates, that the vagueness in the writing is deliberate and the product of fear of the anti-trust laws.

That, of course, does not affirmatively show that the law was violated; moreover, it is true that no evidence is available that DP knew of Beschorman's letter. Consequently, I draw no inference therefrom against DP; but I do draw an inference as to NL's frame of mind in its negotiations with DP.

To return to the negotiation: NL was not at liberty to enter into the 1933 agreement unless and until its foreign associates consented. TG objected. It was particularly concerned lest, as a result of this agreement, TG should find itself in competition, in its own "territory," with DP, the latter armed with TG's own skill, acquired by DP, via NL—a state of affairs which TG regarded as intolerable. To overcome the obstacle of TG's objection, conversations were had between Rupprecht, on behalf of DP, with Beschorman, on behalf of NL, and also between Rupprecht and Jebsen; and as a result of these conversations two letters were written, one by DP to NL with the intention that it be transmitted to TG; and the other by NL to TG to accompany DP's letter.

If DP is bound by the second letter, it unquestionably joined the conspiracy then in effect between NL and its foreign associates. The text of the two letters is set out in the margin.[11]

---

[10] Jebsen, unfamiliar with American laws, would not credit this reason, for he could not understand how NL had undertaken to do that which the DP lawyers claimed was prohibited. But perhaps NL was right after all, since for twenty five years it proceeded unmolested and succeeded, with the aid of the unlawful conspiracy, to build a highly profitable business and to retain a dominant position in the industry.

[11] Krebs Pigment & Color Corporation
 June 28, 1933.
Confidential
W. C. Beschorman, Vice Pres.,
National Lead Company,
 111 Broadway,
 New York City, New York.

Dear Mr. Beschorman:
 We have considered the various points raised by I. G. in their cable to you with the desire, if possible, to comply with its request.
 As you are aware, the Anti-Trust Laws of this country definitely prevent this Corporation from making any commitments respecting the territories of Titangesellschaft and Titan Inc. Further, these several companies are not parties to the Krebs-Titanium Pigment Agreement and so, as to them, we are unable to make any direct commitment. However, since Article II of the Krebs-Titanium Pigment Agreement definitely provides that Krebs is limited both in respect to use and sale to the territories set forth in this Article, we think the result will be eminently satisfactory to your foreign associates. As to controlling the disposition of our products by our customers, we are sure you appreciate the difficulty both from a legal and practical standpoint.
 The I. G. request that Krebs grant no sub-licenses or technical aid to others in the territories of the foreign companies, is tantamount to obligating Krebs to grant exclusive licenses. The whole agreement, you will recall, for definite reasons, was placed on a nonexclusive basis. Since all licenses received from Krebs under its foreign patents, are subject to negotiation, we believe there will be no difficulty in working out a solution that will be acceptable to all parties; it may well be that such negotiations will result in exclusive licenses to your foreign associates.

I believe that DP is bound by the second TG to consent. Rupprecht told Beschorman, letter because (1) DP asked NL to persuade "that it was a selling job for them

Naturally, we shall treat technical information in the same manner as our patents.

The present form of our Agreement is the result of much care and thought on the part of both parties. It embodies, as we see it, a practicable working basis for both companies, as well as for your foreign associates.

Very truly yours,

C. H. Rupprecht,
President.
July 12, 1933

I. G. Farbenindustrie
Aktiengesellschaft
Frankfurt (Main)
Gruneburgplats.

Dear Sirs:

Immediately upon receipt of cablegram of June 22nd from Dr. Jebsen, a copy of which is attached, we took the matter up with the Krebs Pigment & Color Corporation, submitting to them a copy of the cable, and take pleasure in handing you a copy of their reply under date of June 28th. Careful reading of the Krebs letter will surely indicate to you the spirit in which they are entering into this contract and their efforts to meet your views. We feel that experience will prove that such will be the case.

In regard to the phrase "non-exclusive license" to which you call our attention as occurring in Article 5, Paragraph 2, we have to refer to the United States Anti-Trust Laws which absolutely forbid the granting of exclusive license between two manufacturers in the. United States as such a practice would tend to create a monopoly. Therefore, the use of this phrase "non-exclusive license" is simply to comply with the United States Laws and in practice the licenses under each others patents will undoubtedly prove to be, to all intents and purposes, exclusive.

Referring subsequently to the points brought out in your letter of June 20th, under A, B, C, D and E, you will note that the Krebs Company consider themselves limited both as to use, manufacture and selling to the territory granted to them by the agreement. While this agreement does not specifically prevent Krebs from exporting into your territory any products not manufactured under the patents of the Titanium Pigment Company and its associated companies, it will be a difficult matter to discriminate between such manufacture and manufacture under their patents and maintain close and good cooperation, and the practical effect will be that Krebs will refrain from such export.

As to exports by clients of the Krebs Company, we note that Krebs will use all their efforts to prevent any export outside of their territory which would cause any trouble to you in any way.

In regard to licenses, although non-exclusive licenses are specified throughout the agreement, you will note from the letter of Krebs Company that they are not adverse to granting exclusive licenses in case this may be found desirable by you. Under the practice, as we foresee it, these licenses will be given against a nominal payment except in cases of outstanding development.

We also see your point, that by the exclusive license you have given Titan Co. Inc., which has granted exclusive licenses to the Titanium Pigment Co. Inc., you are not in a position to trade with Krebs regarding any American patents belonging to you. However, you may rest assured that your interest in these respects, which are also our own interests in view of our part ownership in the Titangesellschaft, will be fully and completely looked after.

At one time we considered the question of an agreement between the Titangesellschaft and Krebs covering the points in your letter, but have dropped this idea as we felt that you would be better served to have us look after your interests than to complicate the situation with a separate contract.

The only other point in your letter which we do not believe has been covered is your suggestion that the contract be changed from termination in three years to termination in five years. Frankly, there is no possibility of the contract being terminated at any time that we can foresee, and I am glad that you did not make any especial point of this either in the cable or in your letter of June 20th.

May I add that we certainly appreciate your attitude and the views you have put forward in your letter to Dr. Jebsen and trust that you will not be disappointed in the future by following the lines we have suggested. May we ask for further advice from you as to whether the Krebs letter and above make the whole matter satisfactory.

Very truly yours,

W. C. Beschorman,
Executive Vice President.

Copy to—Dr. Kuhne
Dr. Jebsen
Mr. Rupprecht
Mr. Tasker, Vice Chairman,
British T. P. Co.

This letter was sent on July 21, 1933.

[NL] to make I.G. realize that they were putting their interests in National Lead's hands, and that they would be well taken care of"; (Pl.Ex. 268.) (2) Rupprecht was shown the Beschorman letter before it was mailed; and a copy thereof was later sent to him "for your files".[12] There was no repudiation by Rupprecht; or at least, the record shows none; and at this point the burden of going forward with proof of such repudiation shifted to DP. Interstate Circuit, Inc., v. United States, 1939, 306 U.S. 208, 225, 59 S.Ct. 467, 83 L.Ed. 610. Such quiescence on the part of DP can only be construed as ratification. It follows that the assurance that "Du Pont will loyally respect the territory of T.G." which TG discovered in the communications from Rupprecht and Beschorman was an assurance which must be attributed to DP, despite the painstaking efforts on its part to sever the line of imputation. At least then as to territorial delimitations of the titanium pigment business, DP joined the combination.[13] United States v. Masonite Corp., 1942, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461.

 It may well be, and I take it as a fact, that in giving the assurance not to manufacture in or sell in TG's territory, DP was not making a promise; it was doing no more than giving expression to its then existing business policy not to manufacture or sell in Germany and other TG territory; and it may well be that in any event, DP could not successfully compete in Germany. While much has been made of this point, it does not cover the whole issue either factually or legally. Factually it is inadequate, because TG's exclusive territory extended very considerably beyond Germany and included territories where DP might have competed. Legally it is insufficient, because concerted abstinence from commerce is proscribed even where there are valid unilateral reasons for abstaining;[14] and also because DP's assurance, in part, formed the consideration for the continued abstinence of the European producers from exporting to the United States.

It is idle to speculate as to what might have happened had NL and DP insisted on making their agreement without regard to TG's objections. Presumably, had such an event occurred, TG would have been relieved of its promise not to export to the United States. In a very important way, DP's assurance closed the breach which was in the making in the wall built around the titanium business by NL and its foreign associates. It also removed the last obstacle to the establishment of a commercial collaboration between the Titan group and the Blumenfeld companies. True, Rupprecht did not go as far with Blumenfeld as he did with NL. Not as much was necessary. Indeed, no action on his part was necessary since he sought nothing from Blumenfeld. From the somewhat conflicting testimony as to the nature of Rupprecht's conversations with Blumenfeld, I conclude that Rupprecht made no promise; but that he did explain to Blumenfeld DP's policy with respect to the European market, a policy made unilaterally in many respects, but undoubtedly strengthened and territorially extended as a result of the assurances to NL.

This description of DP's position in 1933 is consistent with subsequent developments. To Jebsen, devotee of the precise covenant, advocate and practitioner of clarity and definition in language and obligation, such vague and Janusfaced language was a source of disquiet and apprehension. But he hoped for the best. He regarded Rupprecht as one who rarely descended from "sound to things." But he appraised DP as an organization that would not repudiate an unwritten obligation. Rupprecht, on the other hand, found the business of practicing one code, and writing another, rather strenuous and emotionally confusing. No wonder that communication between DP and NL became somewhat difficult; and, at times, NL's and Tinc's representatives left a conference with very different impressions of what had been agreed to from those entertained by Mr. Rupprecht.

The point is made in behalf of DP that there is no evidence that its Executive

[12] The letter was not found in DP's files.

[13] In view of this finding, I do not reach the question whether doing business with an illegal combination constitutes joining the combination; see Virtue v. Creamery Package Mfg. Co., 1913, 227 U.S. 8, 33 S.Ct. 202, 57 L.Ed. 393; cf. Direct Sales Co. v. United States, 1943, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674.

[14] Compare, United States v. Colgate & Co., 1919, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, 7 A.L.R. 443; United States v. A. Schrader's Son, Inc., 1920, 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471.

Committee knew of Rupprecht's commitments. It is true that no direct evidence of such knowledge is in the record; and I need not trouble to decide whether the circumstances warrant an inference of knowledge. There is abundant evidence that Rupprecht's authority was broad enough to justify charging the corporation with his acts in its behalf.

My general summary of the evidence on this issue is that DP was a member of the combination—true, a special member, with a status, rights and obligations, different from that of the other members, but a member nonetheless.

At this point, DP advances the argument that it had no choice but to do business with the cartel unless it was content to stay out of the titanium field. To put it in the words of DP's counsel:

"We respectfully submit in conclusion that it cannot be the law of the United States that it is the function of the Courts themselves to impose that form of restraint of competition which must result from a ruling that whenever a European company has a monopoly in its own country (and practically all of them do), and then has a relation in the nature of a common enterprise with some American company, it becomes the duty of all other American companies to renounce and forego access to the inventions and developments controlled by those foreign companies, and to leave them as the exclusive property of its American competitor, the partner of those foreign companies."

Perhaps, the answer is that DP, having discovered the conspiracy, should have asked the Attorney General to break it up. Confessedly, the chances of DP getting NL's patents and know-how after such a hostile act would be, to say the least, dubious. But in any event the courts may not validate unlawful conduct because in a particular instance there may be social losses involved in enforcing the law. The paradox which DP discovers, even if it were a genuine one, would be of interest to Congress, not to the courts. But the paradox is not genuine. The conflict is a specious one. Judicial intervention to break up a combination in restraint of trade is not in itself a restraint of trade, although for a time the established channels of commerce

may be disarranged. To prohibit adherence to conspiratorial trade restraints hampers trade in about the same way that the prohibition against the circulation of counterfeit money hampers it. It may prevent the consummation of a particular transaction but in the long run it frees business from private regimentation and secures it against those who would trammel it.

### III. DP's Relations to American Producers.

The case also presents the question whether the contract between NL and DP is offensive to the anti-trust laws independently of the relation of that contract and the parties thereto to the foreign producers.

Here are two competing producers who, at the time their agreement is made, between them control 100% of the commerce in titanium products in the United States. They agree not only to settle their conflicting patent claims—which presumably they may do under the Gasoline Cracking case—but they agree to exchange all future patents, patent applications and know-how. Though these exchanges are not on an exclusive basis, is it not clear, however, that the capacity of such a combination to dominate the market is vastly increased, that the capacity for the exclusion of outsiders from the industry is multiplied? In other words, was not Mr. Ewing, DP's London manager, (whose disavowal of authority to make the following statement I accept) saying no more than the obvious when he wrote in 1933, concerning the NL-DP agreement:

"We look upon this patent pool as a definite advance in cooperation and the strengthening of both parties' position to the exclusion of outsiders"?
I think so.

When the effect of an arrangement is obvious it is fair inference that the parties intended that effect. The accumulation of great power to restrain trade may in itself be an evil. United States v. American Tobacco Co., 1911, 221 U.S. 106, 175, 31 S.Ct. 632, 55 L.Ed. 663. When the power thus acquired is exerted to accomplish unreasonable restraints of trade, it is surely an evil. A pertinent question is, therefore, how did NL and DP exercise the great power they acquired.[15]

---

15 "In the case at bar, the primary defendants own competing patented processes for manufacturing an unpatented product which is sold in interstate commerce; and agreements concerning such processes are likely to engender the evils to which the Sherman Act was directed." Standard Oil Co. v. United States, 1931, 283

NL licensed one American producer, American Zirconium, and on conditions which required submission to the illegal 1920 contract. It never did license Virginia Chemical; and the evidence is rather persuasive that it did not achieve agreement on royalties and could not get from Virginia Chemical written adherence to the 1920 agreement and that Virginia Chemical was not sufficiently well known to the Europeans to warrant acceptance of its oral assurance.

DP licensed both American Zirconium and Virginia Chemical. In both instances the licenses were subject to a severe tonnage limitation on the product made under the license and to a royalty on all titanium dioxide produced, whether under the licensed patents or not. DP makes much of the fact that the evidence shows that it never refused a license. It is also true, however, that until 1944, DP did refuse licenses unencumbered by tonnage limitations.

Another inevitable consequence of the NL-DP agreement has been the proliferation of patents. The chief spur to private resistance to the grant of patent monopolies has been withdrawn from the parties who, ordinarily, would be chiefly concerned. It is not without significance that, despite the jaundiced eye with which the courts have been examining and rejecting patents in recent years, not a single one of the hundreds of patents here involved has ever been litigated. The result of that is that the newcomer is confronted by a veritable jungle of patent claims through which only the very powerful and stouthearted would venture, having a regard for the large initial investment which this business requires. These patents, through the agreements in which they are enmeshed and the manner in which they have been used, have, in fact, been forged into instruments of domination of an entire industry. The net effect is that a business, originally founded upon patents which have long since expired, is today less accessible to free enterprise than when it was first launched.

The exchange of know-how between NL and DP was abandoned in 1940 when, as DP says, the industry matured. The exchange of patents and patent applications continues. The tonnage limitations in the licenses of American Zirconium and Virginia Chemical was eliminated in 1944. The power of concerted action is still there.

I need not consider whether an exchange of patents, present and future, between competitors, is violative of the Sherman Act. I assume that such an exchange standing alone is innocent. But in the context of the present case, Associated Press v. United States, 65 S.Ct. 1416, this exchange between two corporations, who between them controlled the entire market, becomes an instrument of restraint, available for use and used, to continue the mastery of the market which NL and DP achieved by means of the illegal international agreements.

In order to give effect to the Sherman Act, plaintiff is entitled to a decree which will restore titanium to the system of free competition; the means of preventing such a development must be destroyed and the power to prevent it must be shorn from those who, by combination, have acquired it.

It is, perhaps, not customary to express, in an opinion, the praise which the attorneys who tried this case deserve for the very high order of professional learning which they brought to it. Nothing, however, restrains me from commenting favorably upon the cooperative attitude exhibited by them which resulted in shortening the trial by many months.[16]

A decree will be entered for the plaintiff.

### Final Decree.

■ This cause came on to be heard upon the complaint and the answers thereto upon the evidence and upon argument of counsel. The Court having thereafter rendered and filed its opinion and having made and entered findings of fact and conclusions of law wherein the defendants have been found to have been engaged in a combination in restraint of trade and commerce in titanium pigments among the several states of the United States and of foreign nations, and that the defendants have been and now are parties to contracts, agreements, and understandings in restraint of such trade and commerce in violation of Section 1 of the Sherman Act, 26 Stat. 209, 15 U.S.C.A. § 1;

Now, therefore, upon motion of plaintiff by Wendell Berge, Assistant Attorney General, Herbert Berman and William C. Dixon, Special Assistants to the Attorney General, Julian Caplan and Ephraim Jacobs, Special Attorneys, and John F. X.

---

U.S. 163, 175, 51 S.Ct. 421, 426, 75 L. Ed. 926.

[16] Over 1400 exhibits were received in evidence.

McGohey, United States Attorney, for relief in accordance with the prayer of the complaint, and the defendants having severally appeared by counsel, it is ordered, adjudged and decreed as follows:

1. The term "titanium pigments" as used herein shall mean any product containing two percent (2%) or more of the element titanium in a chemically, mechanically or physically combined state and mixtures thereof which can be used as pigments, whether or not adapted for other uses, and also extenders to be used in conjunction with any such product.

2. The term "defendants" shall mean the corporations hereinafter listed who may be identified by the designated abbreviations:

| | |
|---|---|
| NL | National Lead Company |
| Tinc | Titan Company, Inc. |
| DP | E. I. du Pont de Nemours and Company |

3. The term "co-conspirators" shall mean the corporations hereinafter listed, who may be identified by the designated abbreviations:

| | |
|---|---|
| TP | The Titanium Pigment Company, Inc. |
| Krebs | Krebs Pigment & Color Corporation |
| TAS | Titan Co. A/S |
| IG | Interessengemeinschaft Farbenindustrie Aktiengesellschaft |
| TG | Titangesellschaft m.b.H. |
| SIT | Société Industrielle du Titane |
| ICI | Imperial Chemical Industries, Ltd. |
| GW | Goodlass Wall and Lead Industries, Ltd. |
| ISC | Imperial Smelting Corporation, Ltd. |
| BTP | British Titan Products Company, Ltd. |
| NTP or Laporte | National Titanium Pigments, Ltd. |
| CIL | Canadian Industries, Ltd. |
| CTP | Canadian Titanium Pigments, Ltd. |
| Kokusan or KK | Kokusan Kogyo Kabushiki Kaisha |
| TK | Titan Kogyo Kabushiki Kaisha |
| Terres Rares | Société des Produits Chimiques des Terres Rares |
| Thann | Fabriques des Produits Chimiques de Thann et de Mulhouse |
| Montecatini | Societa Anonima Titanium |
| Aussig | Verein fur Chemische und Metallurgische Produktion. |

4. The term "patents as herein defined" shall mean United States letters patent and applications as follows: (a) the letters patent and patent applications listed in Appendix A hereof[17]; (b) all divisions, continuations or reissues of any of the foregoing patents and applications; (c) all patents issued upon such applications; (d) all patents which cover any titanium pigments or any process for the manufacture of titanium pigments issued to any of the defendants within five years from the date of this decree; and all such patents which any of the defendants acquires within such five years; and all such patents of which any of the defendants becomes the exclusive licensee within such five years with power to sublicense.

5. The following agreements are hereby adjudged to be unlawful under Section 1 of the Sherman Act and each of them is hereby cancelled and the defendants and each of them and all persons acting or claiming to act through, for or under them and all successors and subsidiaries of any of the defendants are hereby enjoined and restrained from the further performance of any of the provisions of said agreements and of any agreements amendatory thereof or supplemental thereto:

Agreement dated July 30, 1920, between TP and TAS (Exhibit A);

Agreement between TP and Krebs dated January 1, 1933, as amended January 1, 1941 (Exhibits E and E-3);

Agreements dated July 30, 1920, between NL, TP, The Titanium Alloy Manufacturing Company and TAS (Exhibits A-1 and A-2);

Agreement between TAS and SIT dated March 3, 1927 (Exhibit B);

Agreement between TAS and IG dated October 3 and 20, 1927 (Exhibit C);

Agreement between TAS and IG signed June 24 and October 20, 1927 (Exhibit C-1);

Agreement between TAS and TG signed October 3 and 20, 1927 (Exhibit C-3);

Agreement between TG and TAS dated October 3 and 20, 1927 (Exhibit C-7);

---

[17] Appendix A of the Final Decree containing the list of patents and patent applications referred to is not printed herein.

Agreement between TG and TAS dated October 3 and 20, 1927 (Exhibit C-8);

Agreement dated February 16, 1933 between ICI, ISC, GW and TINC (Exhibit F);

Agreements between TINC, SIT, TERRES RARES, and Thann dated June 5 and 17, 1935 (Exhibits G-1 and G-2);

Agreements between TINC, TERRES RARES, and IG, and between TINC, Terres Rares, IG, TG, Thann, and Doitsu both dated January 18, 1936 (Exhibits J and J-2);

Agreement between NL and CIL dated January 1, 1937 (Exhibit K);

Agreement between NL and CTP dated January 1, 1937, as amended February 27, 1939 (Exhibits K-1 and K-5);

Agreements between DP and TINC dated July 27, 1937, June 20, 1938, April 21, 1939, May 10, 1940, and June 23, 1941 (Exhibits M, N, Q, R and S), and the

"License Field Extender" agreements to which NL or TINC were parties, including the agreement between NL and TINC dated March 28, 1939 (Exhibit O); provided, however, that the provisions of this paragraph with respect to the agreements between TP and Krebs dated January 1, 1933, as amended January 1, 1941 (Exhibits E and E-3) shall not go into effect until the expiration of nine months from the date of this decree.

6. Each of the defendants and each of their directors, officers, agents, employees, successors and subsidiaries and all persons acting, or claiming to act under, through or for them or any of them are hereby enjoined and restrained (a) from entering into, adhering to, maintaining or furthering, directly or indirectly, or claiming any rights under any contract, agreement, understanding, plan or program among themselves, the co-conspirators, or with any other person, partnership or corporation, which has as its purpose or effect the continuing or renewing of any of the agreements listed in paragraph 5 hereof; (b) from entering into, adhering to, maintaining or furthering, directly or indirectly, any contract, agreement, undertaking, plan or program with any other producer or dealer relating to titanium pigments which has as its purpose or effect (1) to divide sales or manufacturing territories, (2) to allocate markets, (3) to limit or prevent United States imports or exports, (4) to grant to any third party any market as its exclusive territory, (5) to keep any third party out of any market; provided, however, that nothing contained in this subdivision (b) of this paragraph 6 shall prohibit any normal and usual arrangements between any defendant and its directors, officers, employees, agents, subsidiaries, or any dealer or distributor, whether or not a co-conspirator; (c) from restricting any purchaser of titanium pigments in the use thereof.

7. Each of the defendants is ordered to grant to any applicant therefor, including any defendant or co-conspirator, a non-exclusive license under any or all of the patents as herein defined at a uniform, reasonable royalty. Such grant may, at the option of the licensor, be conditioned upon the reciprocal grant of a license by the applicant, at a reasonable royalty, under any and all patents covering titanium pigments or their manufacture, now issued or pending, or issued within five years from the date of this decree, if any, owned or controlled by such applicant. Such license or reciprocal license may, at the option of either party, contain a provision for the inspection of the books and records of the licensee by an independent auditor who shall report to the licensor only the amount of royalty due and payable and no other information. During a period of three years from the date of this decree such license or reciprocal license may at the option of either party contain a provision for the imparting in writing, at a reasonable charge, by the licensor to the licensee, of the methods and processes used by the former at the date of the license in its commercial practice under the licensed patents in connection with the production of titanium pigments. The Court reserves jurisdiction to pass upon the reasonableness of any royalty or charge herein directed to be reasonable. Defendants are restrained from attempting to enforce any rights under any foreign patents owned by them or under which they are the exclusive licensees to prevent the exportation of titanium pigments from the United States to any foreign country.

8. Within one year from the date of this decree, defendants NL and Tinc shall present to the Court for its approval a plan for divesting themselves of their stock holdings and other financial interest, direct and indirect, in BTP, CTP, TG and TK, or for the purchase of the entire stock holdings and other financial interests, direct and indirect, in said companies or any of them. Such plan of sale shall not

provide for the transfer of such stock or interest to any other defendant or to any corporation in which any defendant will, upon consummation of the plan, have any interest, provided that this provision shall not preclude transfer of said defendants' stock holdings in BTP to ISC, GW, and ICI, or any of them, or preclude transfer of said defendants' stock holdings in CTP to CIL. The plan shall provide for its completion within two years from the date of this decree.

9. Either American Zirconium Corporation or Virginia Chemical Corporation, their successors or assigns, may at their option, if exercised within six months from the date of this decree, apply for licenses from DP under the provisions of paragraph 7. In the event American Zirconium Corporation, Virginia Chemical Corporation or their respective successors or assigns exercise the foregoing option, DP is enjoined from collecting royalties under any existing license agreement relating to titanium pigments between it and the person exercising the option in respect of any period subsequent to such exercise.. Defendants NL, Tinc and DP are hereby enjoined from bringing, or threatening to bring, any action against any person or corporation for the alleged infringement prior to the date of this decree of any patent as herein defined.

10. The Attorney General of the United States or his proper representative shall, for the purpose of securing compliance with this decree, be permitted (1) access, during the office hours of the defendants, to all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of the defendants, relating to any matters contained in this decree, (2) subject to any legally recognized privilege, without restraint or interference from the defendants, to interview officers or employees of the defendants, who may have counsel present, regarding any such matters; provided, however, that information obtained by the means permitted in this paragraph shall not be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Department of Justice except in the course of legal proceedings for the purpose of securing compliance with this decree in which the United States is a party or as otherwise required by law.

11. Judgment is entered against the defendants for all costs to be taxed in this proceeding.

12. The cancellations, injunctions and all executory action provided for under this decree shall not become effective or operative until ninety days from the date of this decree.

13. Jurisdiction of this cause, and of the parties hereto, is retained by the Court for the purpose of enabling any of the parties to this decree, or any other person or corporation that may hereafter become bound, in whole or in part, thereby to apply to the Court at any time for such further orders, modifications, vacations or directions as may be necessary or appropriate

(1) for the construction or carrying out of this decree, and

(2) for the enforcement of compliance therewith and the punishment of violations thereof.